Argued and submitted January 10, 1992; reassigned March 30, decision of the Court of Appeals and judgment of the circuit court affirmed May 20, reconsideration denied July 27, 1993

Karl L. OBERG,
*Respondent on Review,*

*v.*

HONDA MOTOR CO., LTD.;
Honda R&D Co., Ltd.;
and American Honda Motor Co., Inc.,
*Petitioners on Review.*

(CC A8709-05897; CA A61587; SC S38436)

851 P2d 1084

Jeffrey R. Brooke, of Bowman and Brooke, Phoenix, Arizona, argued the cause and filed the petition for petitioners on review. With him on the petition were Paul G. Cereghini, Phoenix, Arizona; and Thomas W. Brown and James H. Gidley, of Cosgrave, Vergeer & Kester, Portland.

William A. Gaylord, of Gaylord & Eyerman, P.C., Portland, argued the cause for respondent on review and filed a response to the petition. With him on the response was Doris J. Brook, and Raymond F. Thomas of Royce, Swanson & Thomas, Portland.

Jonathan M. Hoffman, of Martin Bischoff, Templeton, Langslet & Hoffman, Portland; and Malcolm E. Wheeler, of Parcel, Mauro, Hultin & Spaanstra, P.C., Denver, Colorado, filed a brief on behalf of *amici curiae* Product Liability Advisory Council, Inc.; The Motor Vehicles Manufacturers Association of the United States, Inc.; The Chamber of Commerce of the United States; National Association of Manufacturers of the United States of America; Business Roundtable; and Chemical Manufacturers Association.

Mildred J. Carmack and Ridgway K. Foley, Jr., P.C., of Schwabe, Williamson & Wyatt, Portland; and James N. Westwood, of Miller, Nash, Wiener, Hager & Carlsen, Portland, filed a brief on behalf of *amicus curiae* Oregon Association of Defense Counsel.

David A. Engels, of Banks, Newcomb & Engels, Portland, filed a brief on behalf of *amici curiae* Consumer Federation of America; United States Public Interest Research Group; Oregon State Public Interest Research Group; Portland Family Head Injury Support Group; Oregon Trial Lawyers Association; and The Southern Poverty Law Center.

James H. Clarke, of Lane Powell Spears Lubersky, Portland, filed a brief on behalf of *amici curiae* Snap-On Tools Corporation; Tim Kash; and Ray Park.

GRABER, J.

Peterson, J., filed a dissenting opinion.

## GRABER, J.

This case involves a product liability claim against defendants, who manufactured and sold a 1985 Honda Model ATC350X three-wheeled all-terrain vehicle (ATV) used by plaintiff. Plaintiff attempted to drive the ATV up a steep embankment; it overturned backward, injuring him. Plaintiff then brought this action against defendants, alleging that they were negligent in manufacturing, distributing, and selling the ATV, because they knew or should have known that it had an inherently dangerous design that rendered it unreasonably dangerous to users, and alleging strict liability.

A jury returned a verdict in favor of plaintiff, awarding both general and punitive damages.[1] Defendants appealed. They argued, among other things, that the trial court erred in admitting in evidence excerpts of various documents generated by the Consumer Product Safety Commission (CPSC),[2] relating to the safety of ATVs. Defendants also argued that the trial court erred in denying their motion for a new trial on the basis of the discovery of new eyewitnesses to plaintiff's accident. Finally, they argued that the award of punitive damages was excessive and, therefore, violated their rights under Article I, section 16, of the Oregon Constitution[3] and the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.[4]

The Court of Appeals held that the trial court did not err in admitting the excerpts from the CPSC documents,

---

[1] The jury awarded plaintiff $919,390.39 in compensatory damages and $5,000,000 in punitive damages. It allocated 20 percent of the fault to plaintiff and 80 percent to defendants. The trial court reduced the compensatory damage award by 20 percent and entered a judgment against defendants for $5,735,512.31.

[2] The Consumer Product Safety Commission is a federal agency that collects, investigates, analyzes, and disseminates information relating to the cause and prevention of death, injury, and illness associated with consumer products in the United States. 15 USC § 2054 (1991).

[3] Article I, section 16, of the Oregon Constitution, provides in part:

"Excessive bail shall not be required, nor excessive fines imposed. Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense."

[4] The Fourteenth Amendment to the Constitution of the United States provides in part:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law[.]"

because that evidence was used for the limited and relevant purpose of showing defendants' knowledge of the allegedly dangerous characteristics of ATVs. *Oberg v. Honda Motor Co.*, 108 Or App 43, 47-48, 814 P2d 517 (1991). The Court of Appeals also held that the trial court did not err in denying defendants' motion for a new trial on the basis of the discovery of new eyewitnesses to plaintiff's accident, because the trial court was entitled to find that the newly discovered evidence probably would not have changed the verdict. *Id.* at 55-56. With respect to punitive damages, the court held that the award did not violate defendants' rights under Article I, section 16, of the Oregon Constitution, because that provision "does not apply in civil actions between private parties." *Id.* at 49-50. Finally, the court held that the award of punitive damages did not violate defendants' rights under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. *Id.* at 50-55. We affirm the decision of the Court of Appeals.

## ADMISSIBILITY OF CPSC DOCUMENTS

Defendants first argue that the trial court erred in allowing plaintiff to read to the jury excerpts from nine CPSC documents. The documents included seven CPSC internal staff memoranda on the safety of ATVs; a CPSC notice of proposed rulemaking and request for comments and data relating to the safety of ATVs; and a CPSC press release concerning ATV-related accidents and injuries.

### A. *Relevance*

During the hearing on defendants' motion *in limine* to exclude documents generated by the CPSC, plaintiff argued that the disputed material was relevant to show that defendants had "notice" of the alleged dangerousness of ATVs and that the material was, therefore, relevant to two issues: the foreseeability of plaintiff's injury and defendants' reaction to the notice as bearing on punitive damages.

OEC 401 provides:

> " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

OEC 402 provides:

> "All relevant evidence is admissible, except as otherwise provided by the Oregon Evidence Code, by the Constitutions of the United States and Oregon, or by Oregon statutory and decisional law. Evidence which is not relevant is not admissible."

Defendants do not challenge the authenticity of the CPSC documents, and they stipulated that they had received each of the documents from which plaintiff read excerpts, at approximately the time of its publication. Defendants do not argue that their knowledge of ATVs' potential instability was irrelevant to the issues at trial. Rather, they argue that the other ATVs and the other accidents described in the disputed documents were so unlike this ATV and this accident that knowledge of the documents did not give defendants notice of anything relevant.

First, defendants contend that the ATVs that were the subject of the CPSC documents were not "substantially similar" to the Honda ATV that allegedly caused the injury in this case. We are unpersuaded. The CPSC documents dealt with ATVs as a class of vehicles. As one of the documents stated, vehicles of that class are of similar design. The trial court was entitled to find that the ATVs that were the subject of the CPSC documents were sufficiently similar to the ATV that caused the injury in this case to provide notice to defendants of danger to persons in plaintiff's position.

Second, defendants contend that the accidents that were referred to or described in the CPSC documents were not "substantially similar" to the accident that caused plaintiff's injury here. Again, we disagree with defendants' contention. One of the excerpts at issue concerned reports of the instability of ATVs as a class. Another concerned reports showing a "pattern of loss of control" specifically associated with ATVs manufactured by Honda. Three excerpts concerned reported incidents in which ATVs overturned backward, and three others more specifically concerned incidents in which ATVs overturned backward while climbing hills. As noted, the ninth excerpt concerned the similarity in configuration among all brands of ATVs. The trial court was entitled to find that the prior occurrences that were described in those

excerpts were sufficiently similar to the accident at issue in this case to make those occurrences relevant.

In summary, the excerpts from the CPSC documents, admitted by the trial court, were relevant to issues at trial. The trial court did not err in so holding.

## B.  *Hearsay*

We next consider defendants' argument that, even if the excerpts from the CPSC documents were relevant to the issue whether defendants had notice of the dangerousness of the product, those excerpts were inadmissible because they were hearsay. OEC 801(3) provides:

> " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Defendants' hearsay objections were not well taken, because the excerpts from the CPSC documents were not offered to prove the truth of the matters asserted therein. Rather, those excerpts were offered for the limited and proper purpose of showing that defendants had knowledge of the potential dangerousness of ATVs. *See* Kirkpatrick, Oregon Evidence 484-85 (2d ed 1989) ("[m]any out-of-court statements may be received in evidence because they are not being offered for the truth of the matter asserted," but for some other purpose, including the purpose of showing that the recipient of the statement had knowledge of the matter asserted therein).

It is clear that the trial court admitted the documents for the limited purpose for which plaintiff offered them. The court gave the following instruction just before the excerpts of CPSC documents were read to the jury:

> "Jurors, I am now going to permit plaintiff's counsel to read to you excerpts from some documents of the federal agency. The documents that I will allow plaintiff's counsel to read to you are not admitted for the purpose of establishing the truth of the statements contained in those documents. That means that you should not assume that the statements in those documents are true.
>
> "These documents are admitted for the limited purpose of notice. Plaintiff has alleged that these documents gave

defendants notice before the date of [plaintiff's] accident that the [ATVs] could overturn.

"I will not suggest to you that these documents constitute adequate notice. The adequacy of the notice is an issue for you to decide. The statements contained in these documents, the ones that will be read to you, may or may not be true. But we are not going to resolve their truth in this courtroom. In other words, they are coming in for a limited purpose on the basis that the plaintiff has alleged that [Defendants] had notice, and this is the evidence that's submitted to you and you will make that ultimate determination."

After plaintiff's counsel read the excerpts, the trial court told the jury:

"Jurors, again, I want to review with you the limitation that the Court has placed on this information. First, I want to remind you that you should not assume that these statements are true. The plaintiff claims that the excerpts that the lawyer just read to you gave [defendants] notice before plaintiff's accident that [ATVs] could overturn, and I'm not suggesting to you that the excerpts just read to you constitute adequate notice. That will be an issue that you will have to decide."

The CPSC documents were not excludable as hearsay.

### C. *Prejudice*

Defendants argued that the probative value of each of the CPSC documents was substantially outweighed by its prejudicial effect. In *State v. Pinnell*, 311 Or 98, 112, 806 P2d 110 (1991), this court explained:

"Under OEC 403, relevant evidence is admissible so long as its probative value is not 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence.'

"OEC 403, like its federal counterpart, FRE 403,

" 'requires the trial judge to go through a conscious process of balancing the costs of the evidence against its benefits. Unless the judge concludes that the probative worth of the evidence is "substantially outweighed" by one or more of the countervailing factors, there is no discretion to exclude; the evidence must be admitted.' "

(Quoting Wright & Graham, 22 Federal Practice and Procedure 263-64.)

The record in this case demonstrates that the trial court went through the conscious process that is required. The court carefully considered the evidentiary costs and benefits of the CPSC documents and concluded that the probative value of those documents was not substantially outweighed by the danger of unfair prejudice. The record permitted a reasonable trial court to draw that conclusion. Having permissibly drawn that conclusion, the trial court was required then to admit the disputed evidence. There was no error.

D. *Conclusion*

The excerpts from the CPSC documents were authentic, were relevant, and were not hearsay. The trial court did not err in admitting them.

## NEWLY DISCOVERED EVIDENCE

We next consider defendants' argument that the trial court erred in denying their motion, made pursuant to ORCP 64B(4)[5] and ORCP 71B(1)(b),[6] for a new trial based on the discovery, after trial, of two eyewitnesses to part of the incident giving rise to plaintiff's injury. The witnesses were a man and his daughter, who was seven years old at the time of plaintiff's accident. Defendants assert that the testimony of those witnesses would have disputed the testimony of the only other eyewitnesses to the accident — plaintiff's two

---

[5] ORCP 64B(4) provides:

"A former judgment may be set aside and a new trial granted in an action where there has been a trial by jury on the motion of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:

"* * * * *

"(4) Newly discovered evidence, material for the party making the application, which such party could not with reasonable diligence have discovered and produced at trial."

[6] ORCP 71B(1)(b) provides:

"On motion and upon such terms as are just, the court may relieve a party or such party's legal representative from a judgment for the following reasons: * * * (b) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 64F[, requiring that a motion for a new trial be filed within 10 days after the entry of the judgment sought to be set aside]."

brothers — in regard to plaintiff's location at the time he began the maneuver that culminated in his accident and in regard to his speed and his position on the ATV during the maneuver. Defendants argue that, because the witnesses would have provided the jury with "important new evidence" on many basic facts of the accident and because they were the only unbiased witnesses to the incident, it was probable that their testimony would have changed the outcome of the trial.

Plaintiff responds that, because the eyewitnesses did not see the ATV turn over, but only saw plaintiff as he started up the hill and again after he had been injured, the testimony of the eyewitnesses "provided no new insight into the nature of plaintiff's accident."

■ This court has not previously considered what factors a trial court should weigh in ruling on a motion for a new trial, under ORCP 64B(4), based on the discovery of new evidence. ORCP 64B(4) is, however, materially identical to *former* OCLA 5-802(4) and *former* ORS 17.610(4). In reviewing the denial of motions made under those statutes, this court consistently stated that applications for a new trial based on newly discovered evidence are not favored and that the grant or denial of such motions is within the sound discretion of the trial court. *See Skoog v. Minkoff*, 260 Or 148, 150-51, 488 P2d 1364 (1971) (stating that principle); *Larson v. Heintz Const. Co.*, 219 Or 25, 72, 345 P2d 835 (1959) (same); *Newbern v. Exley Produce Express*, 208 Or 622, 630-33, 303 P2d 231 (1956) (same); *State v. Davis*, 192 Or 575, 579, 235 P2d 761 (1951) (same). In *State v. Davis, supra*, 192 Or at 579, this court also stated:

> "Newly discovered evidence which will justify a court in granting a new trial must meet the following requirements:
>
> " '(1) It must be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as, with due diligence, could not have been discovered before the trial; (4) it must be material to the issue; (5) it must not be merely cumulative; (6) it must not be merely impeaching or contradicting of former evidence.' § 5-802, O.C.L.A." (Citation omitted.)

The trial court in this case found that there was no lack of diligence by defendants in their efforts to locate the

witnesses before trial. *See* ORCP 64B(4) (stating that prerequisite for granting a new trial for reason of newly discovered evidence); *State v. Davis, supra* (same under former law). After reviewing affidavits from the newly discovered witnesses and other information pertaining to their expected testimony, however, the trial court found that "the newly discovered evidence probably would not have changed the result" of the trial.

■     We conclude that, first, the trial court did not err in applying that standard to the newly discovered evidence. *See* ORCP 64B (new trial may be granted for specified "causes materially affecting the substantial rights" of aggrieved party); *State v. Davis, supra* (under former law, stating test of probable change of result). Second, having reviewed the evidence, we conclude that the trial court did not abuse its discretion in denying the motion. We note, as did the Court of Appeals, the length of time between the accident and the witnesses' statements (four years), the daughter's young age at the time of the accident, the distance from which the witnesses observed plaintiff, the fact that neither witness actually saw the accident, and the fact that the father said that he did not disagree with plaintiff's testimony. Those factors suggest that the newly discovered evidence probably would not have changed the result of the trial.

The trial court did not err in denying defendants' motion for a new trial on the basis of the discovery of the new witnesses.

## CONSTITUTIONALITY OF THE AWARD OF PUNITIVE DAMAGES

We next turn to defendants' constitutional arguments. We first consider defendants' state constitutional claim. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court considers state constitutional claims before federal ones).

### A.   *Article I, section 16*

Defendants argue that the award of punitive damages in this case violated their rights under Article I, section 16, of the Oregon Constitution, set out in note 3, *supra*, to be

free from "excessive fines" and from penalties not "proportioned to the offense." This court has not previously considered the application of that constitutional provision to a civil award of punitive damages.

We begin by examining the text and context of the provision. *See Priest v. Pearce*, 314 Or 411, 415-19, 840 P2d 65 (1992) (setting out method of construing another provision of Oregon Constitution). The first sentence of Article I, section 16, refers to what may be done before and after conviction of a crime. Article I, section 16, limits the amount of bail that may be required; bail relates to criminal proceedings. *See* Article I, section 14 (providing that offenses other than murder and treason shall be bailable). The first sentence of Article I, section 16, further specifies that "excessive fines" may not be imposed. That limitation follows the reference to bail and precedes two sentences relating only to criminal cases. Moreover, at the time that the Oregon Constitution was drafted (as now), a "fine" commonly referred to a criminal penalty. *See* Burrill's Law Dictionary, Part 1, at 491 (1850) ("Fine" means "[a] payment of money imposed upon a party as a punishment for an offence [*sic*]." "To fine" means "[t]o impose a pecuniary punishment; to order, adjudge or sentence that an offender pay a certain sum of money as a punishment for his offence [*sic*].").

The second sentence of Article I, section 16, uses two terms that refer to crimes: "punishments" and "offense." Those terms appear in the two preceding constitutional provisions, where they clearly refer only to crimes. Article I, section 14, relates to bail for criminal "offences" [*sic*], and Article I, section 15, uses the word "punishment" to refer to punishment for crime. *See State v. Wagner*, 305 Or 115, 212, 752 P2d 1136 (1988) (Linde, J., dissenting) ("principles of humane *penal* laws" are "enshrined" in Article I, section 15, and Article I, section 16 (emphasis added)).

The final sentence of Article I, section 16, specifies that it applies "[i]n all criminal cases whatever." That sentence mentions civil cases only as a benchmark, further suggesting that the section does not itself apply to civil cases.

■ Reading Article I, section 16, as a whole, and in context, we conclude that it applies only to criminal cases.

History does not disprove what the text demonstrates. Article I, section 16 was modeled after the equivalent provision of the Indiana Constitution. Carey, *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857*, at 468 (1926). We have found no Indiana court decision or other source antedating Oregon's adoption of the Indiana provision, which might inform us as to what the framers of our constitution understood. *See Priest v. Pearce, supra*, 314 Or at 418-19 (so stating).

We hold that Article I, section 16, of the Oregon Constitution, does not apply to civil awards of punitive damages. The award of punitive damages in this case, therefore, does not violate Article I, section 16.

## B. *Due Process*

Finally, defendants argued on appeal that, because the award of punitive damages in this case was the product of an exercise of standardless discretion by the jury and was "excessive" and "disproportionate," it violated the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States, set out at note 4, *supra*. *Pacific Mut. Life Ins. Co. v. Haslip*, 499 US 1, 111 S Ct 1032, 113 L Ed 2d 1 (1991), which defendants cite in support of this argument, was decided after the trial in this case. In this court, defendants rely on *Haslip* for the proposition that, to afford due process, an award of punitive damages must be subject to comprehensive post-verdict trial and appellate court review and that, because Article VII (Amended), section 3, of the Oregon Constitution[7] restricts the power of Oregon trial and

---

[7] Article VII (Amended), section 3, of the Oregon Constitution, provides in part:

"In actions at law, where the value in controversy shall exceed $200, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

In *Van Lom v. Schneiderman*, 187 Or 89, 110-13, 210 P2d 461 (1949), this court held that the assessment of punitive damages, because it is a matter "committed to the decision of a jury," is a question of fact to which the prohibition in Article VII, section 3 (now Article VII (amended), section 3), applies. *See Friendship Auto v. Bank of Willamette Valley*, 300 Or 522, 537, 716 P2d 715 (1986) (where there was evidence from which the jury could have found that the defendant acted with malice, so as to be liable for punitive damages, the trial court erred under Article VII (Amended), section 3, in entering a judgment for the defendant notwithstanding the jury verdict).

appellate courts to conduct such a review, the required safeguards were absent here.

In response, plaintiff contends that, in approving Alabama's procedure for awarding punitive damages in *Pacific Mut. Life Ins. Co. v. Haslip, supra,* the United States Supreme Court did not establish standards for such awards beyond the general requirements of "reasonableness" and of "adequate guidance" to the jury by the trial court. Plaintiff also contends that the award of punitive damages in this case met those standards.

Because of its significance to our decision here, we begin by examining in detail the decision of the United States Supreme Court in *Pacific Mut. Life Ins. Co. v. Haslip, supra.*[8] In that case, the health insurance policies of four insureds lapsed after an agent of the insurer misappropriated their premium payments. The insureds brought an action for fraud against the insurer. The trial court instructed the jury that, if it found liability for fraud, it could award punitive damages to the plaintiffs.

The jury awarded punitive damages; the trial court approved the award, and the Alabama Supreme Court affirmed it on appeal. The insurer sought certiorari in the United States Supreme Court, on the ground that the award of punitive damages was the product of unbridled jury discretion and that it therefore violated the insurer's rights under the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States.

In considering that assertion, the United States Supreme Court noted that "[p]unitive damages have long been a part of traditional state tort law," *Pacific Mut. Life Ins. Co. v. Haslip, supra,* 111 S Ct at 1041, and that the common-law method of assessing those damages was not *per se* unconstitutional, *id.* at 1042-43. The Court described the common-law method as follows:

"Under the traditional common-law approach, the amount of the punitive award is initially determined by a jury

---

[8] On March 31, 1993, the United States Supreme Court heard oral argument in *TXO Production Corp. v. Alliance Resources, cert granted* ___ US ___, 113 S Ct 594, 121 L Ed 2d 532 (1992) (case below, 187 W Va 457, 419 SE2d 870), a West Virginia case involving a due process challenge to an award of punitive damages.

instructed to consider the gravity of the wrong and the need
to deter similar wrongful conduct. The jury's determination
is then reviewed by trial and appellate courts to ensure that it
is reasonable."

*Id.* at 1042. The Court noted that, on previous occasions, it
had approved awards of punitive damages even where the
"discretion of the jury * * * [was] not controlled by any very
definite rules" and where "there was no statute fixing a
maximum penalty, no rule for measuring damages, and no
hearing." *Ibid.*

The Court cautioned, however, that the mere fact
that punitive damages "have been recognized for so long" did
not mean that "their imposition is never unconstitutional."
Expressing concern about "punitive damages 'run wild,' "
the Court concluded that it must "determine whether the
Due Process Clause renders the punitive damages award in
this case constitutionally unacceptable." *Id.* at 1043.

The Court's analysis proceeded as follows:

"One must concede that unlimited jury discretion — or
unlimited judicial discretion for that matter — in the fixing
of punitive damages may invite extreme results that jar one's
constitutional sensibilities. We need not, and indeed we
cannot, draw a mathematical bright line between the consti-
tutionally acceptable and the constitutionally unacceptable
that would fit every case. We can say, however, that general
concerns of reasonableness and adequate guidance from the
court when the case is tried to a jury properly enter into the
constitutional calculus. * * *

"* * * * *

"1. We have carefully reviewed the instructions [given]
to the jury [by the Alabama court in this case].[9] By these

---

[9] The trial court's instructions in that respect stated:

"Now, if you find that fraud was perpetrated then in addition to compensa-
tory damages you may in your discretion, when I use the word discretion, I say
you don't have to even find fraud, you wouldn't have to, but you may, the law
says you may award an amount of money known as punitive damages.

"This amount of money is awarded to the plaintiff but it is not to compen-
sate the plaintiff for any injury. It is to punish the defendant. * * *

"Now, the purpose of awarding punitive or exemplary damages is to allow
money recovery to the plaintiffs, * * * by way of punishment of the defendant

instructions, the trial court expressly described for the jury the purpose of punitive damages. * * *

"To be sure, the instructions gave the jury significant discretion in its determination of punitive damages. But that discretion was not unlimited. It was confined to deterrence and retribution, the state policy concerns sought to be advanced. And if punitive damages were to be awarded, the jury 'must take into consideration the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong.' * * *

"These instructions, we believe, reasonably accommo- dated [the defendant's] interest in rational decisionmaking and Alabama's interest in meaningful individualized assess- ment of appropriate deterrence and retribution. * * * As long as the discretion is exercised within reasonable constraints, due process is satisfied.

"2.  Before the trial in this case took place, the Supreme Court of Alabama had established post-trial procedures for scrutinizing punitive awards. In *Hammond v. City of Gads- den*, 493 So 2d 1374 (1986), it stated that trial courts are 'to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages.' Among the factors deemed 'appropriate for the trial court's consideration' are the 'culpability of the defen- dant's conduct,' the 'desirability of discouraging others from similar conduct,' the 'impact upon the parties,' and 'other factors, such as the impact on innocent third parties.' The *Hammond* test ensures meaningful and adequate review by the trial court whenever a jury has fixed the punitive damages.

"3.  By its review of punitive awards, the Alabama Supreme Court provides an additional check on the jury's or trial court's discretion. It first undertakes a comparative analysis. It then applies the detailed substantive standards it

---

and for the added purpose of protecting the public by detering [sic] the defendant and others from doing such wrong in the future. Imposition of punitive damages is entirely discretionary with the jury. * * *

"Should you award punitive damages, in fixing the amount, you must take into consideration the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong."

As required by Alabama law, evidence of the defendant's financial worth was not submitted to the jury. *Pacific Mut. Life Ins. Co. v. Haslip*, 499 US 1, 111 S Ct 1032, 1037 n 1, 1044, 113 L Ed 2d 1 (1991).

has developed for evaluating punitive damages. In particular, it makes its review to ensure that the award does 'not exceed an amount that will accomplish society's goals of punishment and deterrence.' *Green Oil Co. v. Hornsby*, 539 So 2d 218 (1989)[.] This appellate review makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.

"Also before its ruling in the present case, the Alabama Supreme Court had elaborated and refined the *Hammond* criteria for determining whether a punitive award is reasonably related to the goals of deterrence and retribution. *Hornsby*, [*supra*]. It was announced that the following could be taken into consideration in determining whether the award was excessive or inadequate: (a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and having the defendant also sustain a loss; (d) the 'financial position' of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.

"The application of these standards, we conclude, imposes a sufficiently definite and meaningful constraint on the discretion of Alabama factfinders in awarding punitive damages. * * *

"* * * The standards provide for a rational relationship in determining whether a particular award is greater than reasonably necessary to punish and deter. They surely are as specific as those adopted legislatively in [Ohio] and [Montana].

"[The insurer] had the benefit of the full panoply of Alabama's procedural protections. The jury was adequately instructed. The trial court conducted a post-verdict hearing that conformed with *Hammond*. * * * [The Supreme Court of Alabama] applied the *Hammond* standards and approved the verdict thereunder. It brought to bear all the relevant factors recited in *Hornsby*.

"We are aware that the punitive damages award in this case is more than 4 times the amount of compensatory damages, is more than 200 times the out-of-pocket expenses of [the plaintiff], and, of course, is much in excess of the fine that could be imposed for insurance fraud [under Alabama law]. * * * While the monetary comparisons are wide and, indeed, may be close to the line, the award here did not lack objective criteria. We conclude, after careful consideration, that in this case it does not cross the line into the area of constitutional impropriety. Accordingly, [the defendant's] due process challenge must be, and is, rejected."

111 S Ct at 1043-46 (footnotes omitted; some citations omitted).

■    In summary, the Supreme Court first identified the constitutional interests required to be safeguarded in the determination of an award of punitive damages: the constitutional interest in ensuring that the finder of fact has "adequate guidance" in making such an award and the constitutional interest in ensuring that the amount of the resulting award is "reasonable." *Pacific Mut. Life Ins. Co. v. Haslip, supra,* 111 S Ct at 1043.[10] The Court then identified the criteria that are applied in Alabama when a jury makes, or a court approves, an award of punitive damages. Finally, the Court determined that the application of those criteria adequately safeguarded the constitutional interests identified, because the criteria "impose[d] a sufficiently definite and meaningful constraint on the discretion of Alabama fact-finders in awarding punitive damages," *id.* at 1045, and because the criteria "provide[d] for a rational relationship" between the amount of an award and a defendant's conduct, the need for punishment, and the need for deterrence, *id.* at 1045-46.

―――――――――

[10] Although the Supreme Court does not use the terms, we interpret those two interests to coincide with the constitutional interests in procedural and substantive due process. A commentator explains that procedural due process in the context of an award of punitive damages relates to the requirement that the procedure employed in making that award be fundamentally fair; substantive due process in that context relates to the requirement that the amount of the award be proportional to the defendant's conduct and may also be implicated when multiple awards of punitive damages are made against the same defendant for the same course of conduct. May, *Fashioning Procedural and Substantive Due Process Arguments in Toxic and Other Tort Actions Involving Punitive Damages After* Pacific Mutual Life Ins. Co. v. Haslip, 22 Envtl L 573, 587-88, 606-07 (1992). Multiplicity of awards is not an issue in this case.

We apply an equivalent analysis to the procedure for determining awards of punitive damages in Oregon product liability actions, to ascertain whether that procedure, although differing in some respects from the Alabama procedure, also adequately safeguards the due process rights of defendants in this state. We begin by setting out the statute establishing the substantive criteria to be considered by Oregon factfinders in deciding, in product liability actions, whether to make awards of punitive damages and in setting the amounts of those awards. ORS 30.925 provides:

"(1)   In a product liability civil action, punitive damages shall not be recoverable unless it is proven by clear and convincing evidence that the party against whom punitive damages is sought has shown wanton disregard for the health, safety and welfare of others.

"(2)   During the course of trial, evidence of the defendant's ability to pay shall not be admitted unless and until the party entitled to recover establishes a prima facie right to recover under subsection (1) of this section.

"(3)   Punitive damages, if any, shall be determined and awarded based upon the following criteria:

"(a)   The likelihood at the time that serious harm would arise from the defendant's misconduct;

"(b)   The degree of the defendant's awareness of that likelihood;

"(c)   The profitability of the defendant's misconduct;

"(d)   The duration of the misconduct and any concealment of it;

"(e)   The attitude and conduct of the defendant upon discovery of the misconduct;

"(f)   The financial condition of the defendant; and

"(g)   The total deterrent effect of other punishment imposed on the defendant as a result of the misconduct, including, but not limited to, punitive damage awards to persons in situations similar to the claimant's and the severity of criminal penalties to which the defendant has been or may be subjected."

In addition, ORS 41.315 provides:

"(1)   Except as otherwise specifically provided by law, a claim for punitive damages shall be established by clear and convincing evidence.

"(2) In a civil action in which a party seeks punitive damages from another party, evidence of the financial condition of a party shall not be admissible until the party seeking such damages has presented evidence sufficient to justify to the court a prima facie claim of punitive damages."[11]

More generally:

" 'Punitive damages are allowed in Oregon to punish a willful, wanton or malicious wrongdoer and to deter that wrongdoer and others similarly situated from like conduct in the future. *Martin v. Cambas*, 134 Or 257, 293 P 601 (1930); *accord Noe v. Kaiser Foundation Hospitals*, 248 Or 420, 435 P2d 306 (1967).' *State ex rel Young v. Crookham*, 290 Or 61, 65, 618 P2d 1268 (1980). Punitive damages 'are not a substitute for compensatory awards nor an offset against litigation expense.' *Id.*; *see also Andor v. United Air Lines*, 303 Or 505, 511-13, 516-17, 739 P2d 18 (1987). * * *

"* * * [T]he appropriate line of analysis that this Court has said a jury should follow in cases involving potential awards of punitive damages [is]:

---

[11] Defendants do not claim that the trial court failed to instruct the jury concerning the statutory criteria or that the jury did not properly apply those criteria. The trial court instructed the jury as follows:

"Punitive damages: If you have found that plaintiff is entitled to general damages, you must then consider whether to award punitive damages. Punitive damages may be awarded to the plaintiff in addition to general damages to punish wrongdoers and to discourage wanton misconduct.

"In order for plaintiff to recover punitive damages against the defendant[s], the plaintiff must prove by clear and convincing evidence that defendant[s have] shown wanton disregard for the health, safety, and welfare of others.

"* * * * *

"If you decide this issue against the defendant[s], you may award punitive damages, although you are not required to do so, because punitive damages are discretionary.

"In the exercise of that discretion, you shall consider evidence, if any, of the following:

"First, the likelihood at the time of the sale [of the ATV] that serious harm would arise from defendants' misconduct.

"Number two, the degree of the defendants' awareness of that likelihood.

"Number three, the duration of the misconduct.

"Number four, the attitude and conduct of the defendant[s] upon notice of the alleged condition of the vehicle.

"Number five, the financial condition of the defendant[s].

"And the amount of punitive damages may not exceed the sum of $5 million."

> " '[t]he finder of fact must determine what punitive damages, if any, to award based on the proper premise of deterring future similar misconduct by the defendant or others. To this end, a number of factors may be relevant, including the seriousness of the hazard to the public, the attitude and conduct of the wrongdoer upon learning of the hazard, the number and position of employees involved in causing or covering up the misconduct, the duration of the misconduct and/or its cover-up, the financial condition of the wrongdoer, and prior and potential punishment from similarly situated plaintiffs or other sources.'

> "*State ex rel Young v. Crookham, supra,* 290 Or at 72."

*Honeywell v. Sterling Furniture Co.*, 310 Or 206, 210-11, 797 P2d 1019 (1990).

■ In summary, in Oregon, as in Alabama, the factfinder must consider the "culpability" of a defendant. ORS 30.925(1); *Haslip, supra,* 111 S Ct at 1044. "Objective" criteria, *see Haslip, supra,* 111 S Ct at 1046, considered in Alabama, and required to be considered in Oregon product liability actions, include the likelihood of harm from a defendant's conduct, the duration and profitability of the conduct, the defendant's awareness or concealment of it, the defendant's financial position, and the imposition of other sanctions on the defendant.[12] Oregon law also provides an extra precaution; a plaintiff must prove entitlement to punitive damages by clear and convincing evidence, rather than a mere preponderance. ORS 30.925(1); ORS 41.315(1). We conclude that, in product liability actions in Oregon, as in Alabama cases, application of objective criteria ensures that sufficiently definite and meaningful constraints are imposed on the finder of fact and ensures that the resulting award is not disproportionate to a defendant's conduct and to the need to punish and deter.

■ Neither is the Oregon procedure in product liability actions rendered unconstitutional by the fact that objective

---

[12] The Oregon statutory criteria are almost identical to the criteria established in the Ohio statute that is noted approvingly by the Supreme Court in *Haslip*. 111 S Ct at 1046. In Ohio, however, the criteria are applied by the trial court after the factfinder — whether a jury or the court — determines that the defendant is liable for punitive damages. Ohio Rev Code Ann § 2307.80.

criteria are applied during the factfinder's *initial* determination of the amount of an award of punitive damages, rather than during post-verdict or appellate review of the award. We do not interpret *Haslip* to hold that an award of punitive damages, to comport with the requirements of the Due Process Clause, always must be subject to a form of post-verdict or appellate review that includes the possibility of remittitur. *See* May, *Fashioning Procedural and Substantive Due Process Arguments in Toxic and Other Tort Actions Involving Punitive Damages After* Pacific Mutual Life Ins. Co. v. Haslip, 22 Envtl L 597, 601 (stating that *Haslip* leaves open that question); *Union Nat. Bank of Little Rock v. Mosbacher*, 933 F2d 1440, 1447-48 (8th Cir 1991) (reviewing the *Haslip* decision and stating that the Supreme Court considered Alabama's jury instructions, post-trial scrutiny, and appellate review to be "significant factors" in determining the constitutionality of that state's procedure).[13] Rather, in *Haslip*, the Court determined only that the Alabama procedure, as a whole and in its net effect, did not violate the Due Process Clause. *See Pacific Mutual Life Ins. Co. v. Haslip, supra*, 111 S Ct at 1043 (Court's task was to determine whether the Due Process Clause rendered constitutionally unacceptable the punitive damages award in that case).

Similarly, we believe that Oregon's procedure in product liability actions — as a whole and in its net effect — is constitutional. If anything, initial application of the constitutionally sufficient objective criteria enumerated in ORS 30.925, rather than post-hoc application of those criteria, increases the protective effect of the criteria. *See Haslip, supra*, 111 S Ct at 1060-61 (O'Connor, J., dissenting) (Alabama system violates due process, because that system vests standardless discretion *in the jury* to fix a penalty and

---

[13] The California Supreme Court, considering the decision of the United States Supreme Court in *Haslip, supra*, in the context of the limited question whether a defendant's financial condition is a proper criterion for consideration in the assessment of punitive damages, stated in *dictum* that *Haslip* "has made clear a constitutional mandate for meaningful judicial scrutiny of punitive damage awards." *Adams v. Murukami*, 54 Cal 3d 105, 813 P2d 1348, 1356 (1991). *See also Alexander v. Evander*, 88 Md App 672, 596 A2d 687 (1991) (*Haslip* implicitly requires both standards to guide the jury's and trial court's discretion *and* judicial review of jury verdicts). To the extent that the statement of the California Supreme Court does not account for variations in pre-verdict procedures for determining punitive damage awards, we disagree with it.

provides for application of standards only on review of jury award; *jury* should be instructed in, and apply, Alabama criteria).

We also note that the trial court, after the verdict, and the appellate courts are not entirely powerless. If there is no evidence to support the jury's decision — in this context, no evidence that the statutory prerequisites for the award of punitive damages were met — then the trial court or the appellate courts can intervene to vacate the award. *See* ORCP 64B(5) (trial court may grant a new trial if the evidence is insufficient to justify the verdict or is against law); *Hill v. Garner*, 277 Or 641, 643, 561 P2d 1016 (1977) (judgment notwithstanding the verdict is to be granted when there is no evidence to support the verdict); *State v. Brown*, 306 Or 599, 604, 761 P2d 1300 (1988) (a fact decided by a jury may be re-examined when a reviewing court can say affirmatively that there is no evidence to support the jury's decision).

Moreover, appellate review is available to test the sufficiency of the jury instructions. *See* ORCP 59 H (prescribing method of preserving alleged instructional error for appeal). Thus, defendants in Oregon can obtain post-verdict review to ensure that the jury was instructed properly and that there was evidence to support the jury's award of punitive damages. *See also Honeywell v. Sterling Furniture Co.*, *supra*, 310 Or at 210-14 (holding that it was prejudicial error to instruct a jury that a portion of any punitive damages award would be used to pay the plaintiff's attorney fees and a portion would go to the Criminal Injuries Compensation Account, and reversing award of punitive damages).

Those procedural protections, in turn, ensure that an award of punitive damages in a product liability action bears a rational relationship to a defendant's conduct and to the need for punishment and deterrence. As the Fifth Circuit Court of Appeals noted in *Eichenseer v. Reserve Life Ins. Co.*, 934 F2d 1377, 1382 (5th Cir 1991):

> "Under *Haslip*, an award of punitive damages does not meet constitutional requirements unless the circumstances of the case indicate that the award is reasonable. This condition, contrary to the assertion of [the defendant], is not a vehicle for expansive appellate review of punitive damages awards. * * *

"* * * Accordingly, in reviewing the constitutionality of an award of punitive damages, a court may not explicitly or implicitly recalculate the award of damages; moreover, it may not express an opinion whether the award is too high or too low. Rather, the court may only consider whether the circumstances of the case offer some support for the amount of the award. If there are *any* circumstances of probative value that support the amount of the award, then that award meets the 'reasonableness' prong of the due process test in *Haslip*." (Footnote omitted; emphasis in original.)

The court added that:

"the procedural protection adequate to support the constitutionality of a punitive damages award varies with the circumstances. * * * As long as there is some meaningful procedural assurance that the amount of the award is not an impulsive reaction to the wrongful conduct of the defendant, the award survives the procedural protection aspect of the due process analysis in *Haslip*." *Id.* at 1385.

The court concluded that the award of punitive damages in that case "did not lack support in the record." *Id.* at 1382. *See also Morgan v. Woessner*, 975 F2d 629, 641 n 8 (9th Cir 1992) (stating, in the context of the defendant's claim that the award of punitive damages violated due process, that the trial court's instructions to the jury — that the jury must find by clear and convincing evidence that the defendant was culpable, must consider the relationship between the award and the harm suffered by the plaintiff, must consider deterrence and retribution, must not make an award out of passion or prejudice, and must consider the defendant's financial worth — "appear to meet all the concerns of the *Haslip* court"); *Herman v. Sunshine Chemical*, 257 NJ Super 533, 608 A2d 978, 983 (1992) ("[w]hether to award punitive damages and their amount is within the discretion of the trier of fact").[14]

We also note that the relatively narrow scope of appellate review of punitive damages awards in Oregon is similar to that available to federal appellate courts reviewing

---

[14] In *Haslip*, the Court stated that the award of punitive damages, which was upheld, was more than 4 times the amount of compensatory damages and more than 200 times the amount of out-of-pocket expenses of the plaintiff. 111 S Ct at 1046. The proportions here are similar. The award of punitive damages here is about 5.4 times the amount of compensatory damages and about 258 times the amount of out-of-pocket expenses of plaintiff. *See* note 1, *supra*.

awards of punitive damages made in federal district courts applying state law in cases involving diversity jurisdiction. *See Browning-Ferris Industries v. Kelco Disposal, Inc.*, 492 US 257, 109 S Ct 2909, 2922-23, 106 L Ed 2d 219 (1989) (noting the limited scope of review of punitive damage awards by federal appellate courts in cases involving diversity jurisdiction). In *Mattison v. Dallas Carrier Corp.*, 947 F2d 95 (4th Cir 1991), the Fourth Circuit Court of Appeals reviewed an award of punitive damages made by a federal district court applying South Carolina law. The court noted that its scope of review was restricted in part by the Seventh Amendment to the Constitution of the United States, which applies only to federal courts and which provides:

> " 'In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of common law.' "

*Id.* at 99 and 99 n 1.

The court examined the United States Supreme Court's approval of the Alabama system of determining punitive damages:

> "[*Haslip's*] unusual approach of emphasizing post-verdict review to the extent of perhaps slighting a review of the pre-verdict process raises significant questions when federal courts, sitting in diversity cases, are confronted with the proper application of state punitive damages. The legitimizing constraints provided by the quasi *de novo* review process practiced under Alabama state law cannot be applied by a federal district court. * * *
>
> "* * * * *
>
> "The law of South Carolina permits a jury to award punitive damages to punish, deter, and vindicate the rights of the plaintiff whenever the conduct of the defendant is willful, wanton or reckless. The plaintiff must prove by clear and convincing evidence that the conduct included a 'consciousness of wrongdoing' at the time of the conduct. Punitive damages may be awarded only if actual damages are awarded.
>
> "The amount of the penalty is committed to the discretion of the jury. The Supreme Court of South Carolina has repeatedly announced that no formula applies in awarding

punitive damages and [that] their award and amount are 'peculiarly within the judgment and discretion of the jury * * *.' Thus, * * * there is no appropriate ratio between actual damages and punitive damages * * *. Similarly, there is no requirement that punitive damages bear any specified relationship to the wealth of the defendant. * * * Moreover, punitive damages awards would apparently be upheld in the absence of any evidence of the worth of the defendant.

"The only constraint on the award by the jury is provided by the discretion given to the trial court to review the award for excessiveness. The review by the appellate court is under an abuse-of-discretion standard. The appellate court will reverse a trial court's refusal to set aside an award only when the award is ' "so shockingly excessive as manifestly to show" ' that the jury was actuated by caprice, passion or prejudice.'

"When the verdict is returned in a federal court * * *, no significantly greater restraint is provided.

"* * * * *

"Since the argument in this case, the Supreme Court of South Carolina [has] adopted * * * a more elaborate post-trial review to be conducted in the future by state trial courts in an attempt to avoid due process challenges. * * * [T]he court announced new factors to be considered * * *."

*Id.* at 99-100, 106. The factors announced by the South Carolina Supreme Court included the defendant's degree of culpability, the duration of the culpable conduct, the defendant's awareness or concealment of it, the existence of similar past conduct, the likelihood that the award would deter the defendant or others from similar conduct, the determination whether the award is reasonably related to the harm likely to result from the conduct, the defendant's ability to pay, and "other factors" deemed appropriate. *Id.* at 106.

The Fourth Circuit concluded that the defendant in the diversity jurisdiction case before it was denied due process, because the jury making the award exercised the unconstrained discretion permitted to it by South Carolina law and because the state's newly elaborated substantive post-verdict constraints could not be applied by the federal appellate court. The court directed that, on remand, the federal district court "incorporate" those newly elaborated standards into its instructions to the jury. *Id.* at 105-10.

The Fourth Circuit later reached a similar result in its review of an award of punitive damages made in federal district court under Virginia law. *Johnson v. Hugo's Skateway*, 974 F2d 1408 (4th Cir 1992). Virginia law, like South Carolina law, provided minimal constraints on the discretion of juries in the determination of awards of punitive damages. *Id.* at 1415. The Fourth Circuit again concluded that the substantive criteria applied in Virginia's post-verdict review process in state court must be applied in federal court by the factfinder. *Id.* at 1418.

ORS 30.925 provides essentially the same protection to defendants as the Fourth Circuit granted to the defendants on remand in *Mattison* and *Johnson*. In contrast to the unconstrained discretion allowed to factfinders by South Carolina and Virginia law in those cases, the criteria established by ORS 30.925 are detailed and objective, resulting in their also being constitutionally sufficient. The criteria need not be applied in post-verdict or appellate review, but are permissibly — even preferably — applied by juries in the initial determination of punitive damages awards.

The jury in this product liability action was instructed properly about the substantive criteria to be applied in considering punitive damages. There was evidence to support its determination. Accordingly, the punitive damages award in this case did not violate the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

**PETERSON, J.,** dissenting.

I disagree with the majority on two points. I would hold that the trial court erred in admitting the Consumer Product Safety Commission documents. Second, I believe that due process requires post-verdict review beyond that which the majority finds sufficient (which, essentially, is no post-verdict review).

The Consumer Product Safety Commission (CPSC) is a federal "independent regulatory commission" created by Congress to regulate consumer products, by protecting the

public against unreasonable risks of injury associated with consumer products, assisting consumers in evaluating the comparative safety of consumer products, developing uniform safety standards for consumer products, and promoting research and investigation into the causes and prevention of product-related injuries and illnesses. 15 USC §§ 2051, 2053 (1991). The record shows that CPSC received product safety reports under a "NEISS" reporting system. Concerning the CPSC and the NEISS system, one witness testified:

"Q. [BY DEFENSE COUNSEL] What * * * is the function of the Consumer Products Safety Commission?

"A. It's the federal agency charged by the Consumer Products Safety Act to monitor the safety of consumer products to provide consumers with comparative safety data on consumer products, and to take such actions as the legislation dictates to perform its function.

"Q. You mentioned the NEISS Data System, and there's been reference to that earlier in this trial. My question first, sir, is could you give us an explanation of the NEISS System, including what that acronym means * * *.

"A. * * * N E I S S, National Electronic Injury Surveillance System, and it truly is an electronics surveillance system.

"The Consumer Products Safety Commission pays an individual to work in currently it's about one and a half percent of all the hospital emergency rooms in the nation, and this is a carefully selected one and a half percent, to be statistically representative of the entire population of emergency rooms. * * * And in these hospitals, individuals are paid to acquire information from admitted patients to the emergency room on whether or not their injury was related to a consumer product. And the relationship has just got to be some sort of association or relation, that is, if you were standing on a chair to change a light bulb and you fell off the chair, that would likely be coded as light bulb related and chair related, even if you never got to the light bulb, because you were trying to get to the light bulb.

"And along the same lines, if you stepped on a roller skate and ultimately fell down a stair, you would be coded that would get two product codes, related to stairs and roller skates, or so on down the line. As you can imagine the range. And the data is collected by product category, that is roller skates are a category, stair steps are a category. Light bulbs,

incandescent are a category as opposed to light bulbs fluorescent, and so on down the line.

"And there are 850 categories that are monitored. And the CPSC coder collects that information daily and transmits that information electronically to the Consumer Products Safety Commission in Washington. That's why it's the National Electronic Injury Surveillance System. The function of that system and the reason it is a daily entry is it is the hope and the design of the system that if for instance a sudden — there was a sudden importation of toys from some Third World country that had tainted, say stuffed toy that had poisonous fur, it would be the hope of the system to begin to catch a sudden unanticipated rise in the poisonings associated with stuffed toys or child admissions to emergency rooms and would cause — it wouldn't be this monthly stuff that the emergency rooms would treat patients all month and then next month the paper would go to Washington.

"The next month they'd look at the paper and you would be three months into these toys before you figured out there was a problem. By transmitting that information electronically daily to the CPSC headquarters, they would hope to see a blip if it happened in one of their 850 categories, and take action.

"* * * * *

"Q. Does the NEISS data in any way attempt to explain how accidents occurred or why?

"A. No. I mean basically what I've described to you is just about all the information you can put in a report. Even the product type itself is not described. In other words, you don't get a description of a Schwinn Bicycle, you get product code through something, it will be a four digit code for bicycles, two-wheel.[1]

---

[1] This testimony is similar to the summary of the NEISS system described in Edward J. Heiden, Alan R. Pittaway, and Rosalind S. O'Connor, *Utility of the U.S. Consumer Product Safety Commission's Injury Data System as a Basis for Product Hazard Assessment*, 5 J Prod Liab 295, 295 and 295 n 1 (1982):

"The U.S. Consumer Product Safety Commission (CPSC) has jurisdiction over approximately 10,000 products, with the power to recall, ban, regulate safety characteristics, or provide product safety information. The basis for all CPSC action is its system of health and safety data. The precision, accuracy, and reliability of these data are a critical issue for CPSC, consumers, and the business community dealing with liability considerations for CPSC-regulated products.

"One of the principal bases for CPSC's actions is the National Electronic Injury Surveillance System (NEISS), a reporting system based on product-associated

"'* * * * *

"Q. Dr. McCarthy, is there another level or layer of data collection utilized by the CPSC?

"A. There are several.

"Q. What's the next layer?

"A. Occasionally there will be what's called the term for it is an IDI, an In-Depth Investigation, IDI. And most of the time that's a phone call. I mean it's called an In-Depth Investigation, but overwhelmingly that's a phone call.

"Q. Would you describe in a little greater detail what kinds of data and how it's collected in the IDI process

"A. Well, IDIs can occur, an In-Depth Investigation can occur for any number of reasons and take any number of forms, but most of the time they will be an injury and something will look interesting, or for some reason the product category will be flagged that month for IDIs, and one will make a follow-up phone call to the residence of the individual who was treated at the hospital, because when you get admitted to a hospital, especially when the NEISS coder is there, they've got your phone number, right? So they can call your home. Now, there's no real requirement, and indeed it's not uncommon for a quarter or a third of these In-Depth Investigations not even to talk to a witness. Someone does have to answer the phone. And they talk to them about the nature of the injury, the accident, they may or may not be a witness, just generally what happened, if someone knows; if

injuries that occur in a national sample of emergency rooms within approximately seventy-five hospitals. NEISS is used as a basis to obtain estimates of the total of all national medically attended injuries associated with the great majority of consumer products.[1] The national estimates consist of three methodological elements: (1) recording of injury data, in terms of product(s) associated with that injury, from the sample of emergency room visits (ERVs); (2) projection of sample data upward to an estimate for the total universe of all emergency room product-related injury visits; and (3) projection of total national emergency room injuries from (2) to a total for all medically attended injuries.

"[1.] Injuries associated with consumer products are reported via teletype either by in-house hospital personnel or contractor personnel to a central computer on a frequent basis — usually daily — for several hundred general product codes. Each injury report indicates a product, the type of injury involved, and provides information about the victim and the injury — age, sex, injury diagnosis, body part involved, locale, date of treatment, whether the victim was treated and released, was hospitalized, or was dead on arrival at the emergency room. A subset of these cases is selected for in-depth follow-up investigation for products of special interest to CPSC staff or Commissioners."

they don't know or won't talk to them, that may be it. Most of the time that is it. After the phone call, that's the end of the investigation."

The NEISS statistics included information about all ATVs, irrespective of who the manufacturer was or how the accident happened.

At the end of plaintiff's case-in-chief, copies of nine CPSC documents were received in evidence, over the objections of defendants. Copies of the exhibits are set forth in the Appendix. The exhibits include three kinds of information:

1. Interoffice memoranda containing information about ATV accidents reported to CPSC.

2. Interoffice memoranda containing opinions of CPSC personnel concerning the safety or design of ATVs.

3. CPSC notices concerning ATVs.

The majority holds that all the documents were relevant and admissible. I disagree.

OEC 801(3) provides:

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Plaintiff asserts that these exhibits were "offered to prove notice to Defendants of [their] contents, not for the truth of the matter asserted, and therefore [were] not hearsay." Plaintiff read the *nine* exhibits — Exhibits 20, 23, 25, 28, 31, 37, 120, 121, and 122 — to the jury. Before the exhibits were read to the jury, the trial judge told the jury:

"Jurors, I am now going to permit plaintiff's counsel to read to you excerpts from some documents of the federal agency. The documents that I will allow plaintiff's counsel to read to you are not admitted for the purpose of establishing the truth of the statements contained in those documents. That means that you should not assume that the statements in those documents are true.

"These documents are admitted for the limited purpose of notice. Plaintiff has alleged that these documents gave defendants notice before the date of the Oberg's [*sic*] accident that the ATVs could overturn.

"I will not suggest to you that these documents constitute adequate notice. The adequacy of the notice is an issue for you to decide. The statements contained in these documents, the ones that will be read to you, may or may not be true. But we are not going to resolve their truth in this courtroom. In other words, they are coming in for a limited purpose on the basis that the plaintiff has alleged that Honda had notice, and this is the evidence that's submitted to you and you will make that ultimate determination."

The trial judge's decision on the "other accidents" evidence was made after days of discussions between the trial judge and the lawyers on the subject. On April 3, 1990, after an extensive discussion between the trial judge and counsel, the court stated:

"Now, we're going to have to have a subdivision because I recognize that there is going to be controversy on the word 'stability,' so the first criterion is that before a document will be considered by the Court, it has to deal with lack of stability.

"Then that will be divided into two components, instability, which relates to rearward — what do you call that?

"[DEFENDANTS' LAWYER]:   Rearward turnover.

"[PLAINTIFF'S LAWYER]:   Flips, Your Honor.

"THE COURT:   — which reasonably is similar to the normal test of similarity of our accident. And then the other criteria are those things which the Plaintiff is saying that this report deals with instability in general.

"I'm signaling the Plaintiff's team that you are going to have difficulty in convincing me that general instability will be adequate, but I'll certainly look at every document you want me to look at."

Seven of the nine exhibits are internal office memoranda, one (Exhibit 122) is a CPSC press release, and one (Exhibit 37) is a notice of proposed rulemaking published in the Federal Register.

There actually are two issues concerning the admissibility of the CPSC documents. One concerns the admissibility of the CPSC documents in light of the evidentiary rule that limits evidence of other accidents. The second issue concerns the admissibility of opinions contained in a public

agency's records. I first discuss the evidence of other accidents.

Both parties appear to agree as to the rule applicable to evidence of other accidents. *Rader v. Gibbons and Reed Co.*, 261 Or 354, 359, 494 P2d 412 (1972), states the rule as follows:

> "Evidence of prior similar occurrences is admissible under some circumstances in a negligence action. As a general rule, evidence of prior accidents or acts of negligence is not admissible to prove a specific act of negligence. Such evidence is, however, admissible to prove the existence of a continuing defect or a continuing course of negligent conduct, and that the condition or course of conduct is in fact dangerous, or that the defendant had notice of its dangerous character. *The admissibility of such evidence for these purposes is, however, subject to the requirement that the prior accidents must have occurred under similar conditions and circumstances.*" (Emphasis added; citations omitted.)

This court, in a long line of cases, has held that, in a negligence case, evidence of prior accidents is not admissible "to prove a specific act of negligence." Such evidence may be admissible, however, as notice to a defendant of, among other things, a dangerous condition. In *Rader*, the plaintiff's decedent was killed when the windshield in the car in which the decedent was riding was struck by a falling rock. A policeman who regularly patrolled the area testified that, on previous occasions, large trucks carried rock on the haul road. There was evidence that shows that rocks had fallen onto the highway from the haul road, and that the defendant was aware of this. The court upheld the ruling admitting the evidence, saying that "the evidence objected to tended to show both the existence of a dangerous condition and that defendant had notice of the dangers. The real question is whether the circumstances were sufficiently similar in each instance." 261 Or at 360.

*Rader* is a pre-evidence code decision, and the Oregon Evidence Code does not itself touch on this relevancy issue. Plaintiff states that "[t]he 'similarity' issue * * * is no more than a question of relevance" and that the rule stated in *Rader* is the rule to be applied. I agree.

The "other accident" evidence in the exhibits is very general.[2] References are made to many different types of accidents and to machines manufactured by other companies. There is no evidence in this record concerning other accidents that provides any detail concerning the manner in which the accidents occurred. When this court has upheld the admission of evidence of other accidents, the record contained evidence of the manner in which those other accidents occurred. *See Rader v. Gibbons and Reed Co., supra,* 261 Or at 361 (testimony concerning rocks falling on earlier occasions on very highway where accident occurred held admissible because it "tends to prove that the movement of equipment on the haul road created a danger of accidents like that suffered by [plaintiff]"); *Clary v. Polk County,* 231 Or 148, 152, 372 P2d 524 (1962) (evidence showing prior accidents at the same place "is some evidence that the condition was dangerous"); *Saunders v. Williams & Co.,* 155 Or 1, 7, 62 P2d 260 (1936) (evidence that witness had slipped in oil on the floor of the defendant's store on two prior occasions held admissible to show a continuing defect or condition). This is necessary in order to determine whether the other accidents occurred under similar conditions and circumstances.

Unquestionably, the evidence received is replete with prejudicial information about ATVs. But aside from some general comments that there were a lot of ATV accidents involving tipping over backward, there was no specific evidence of even one accident that "must have occurred under similar conditions and circumstances." *Rader v. Gibbons and Reed Co., supra,* 261 Or at 359. The documents received show that the reported accidents may have had a number of different causes, such as "loss of control" or hitting a bump, ditch, or other terrain feature.

In the decisions from other courts involving product claims where evidence of other accidents was offered, the courts have adhered to the requirement that the evidence of the other accidents be more specific, more detailed, than is the

---

[2] The information that CPSC obtained concerning other accidents was received from hospitals. All of the reports are "double hearsay" or "hearsay within hearsay" in the sense that some person told a care-giver about the accident, and the care-giver reported to CPSC. Unless otherwise stated, for purposes of this discussion, concerning "other accidents," I assume that the evidence is not subject to a valid hearsay objection.

case here. The Tenth Circuit Court of Appeals recently considered the very issue here before us. *Kloepfer v. Honda Motor Co., Ltd.*, 898 F2d 1452 (10th Cir 1990), arose out of a rearward overturn accident of a three-wheeled Honda ATV on a steep hill and involved claims that the ATV was defective in its design and warnings. Unlike this case, however, the federal district court excluded evidence of the CPSC study of ATVs. The Tenth Circuit Court of Appeals affirmed, noting that "the proffered reports were not limited to three-wheeled vehicles, did not relate to an investigation into this accident or to the Honda model involved herein, but rather accidents, injuries and statistics involving all-terrain vehicles manufactured by over twenty manufacturers." *Id.* at 1458. The court also observed that there was "a real possibility that the jury would give undue deference to such evidence." *Ibid.*

Other courts have excluded CPSC-generated reports as inadmissible hearsay. For example, in *McKinnon v. Skil Corp.*, 638 F2d 270, 278-80 (1st Cir 1981), the court considered the admissibility of several CPSC reports concerning circular saw guards. Like this case, the plaintiff claimed that CPSC reports gave the defendant "notice" of prior accidents, established a defect, and undermined the credibility of one of defendant's witnesses. The First Circuit Court of Appeals noted that the proffered CPSC reports contained multiple levels of hearsay and held that they were properly excluded.

Similarly, in *Henkel v. R and S Bottling Co.*, 323 NW2d 185, 192-93 (Iowa 1981), the Iowa Supreme Court held that the trial court properly excluded evidence of a CPSC "hazard analysis" similar to plaintiff's Exhibit 28. The plaintiff contended that a CPSC report titled "Hazard Analysis of Carbonated Soft Drink Bottles" was admissible under the public records exception to the hearsay rule. The court concluded that the CPSC report lacked the indicia of trustworthiness necessary for admissibility and that the report would have misled the jury. *Accord: Prashker v. Beech Aircraft Corporation*, 258 F2d 602, 608-09 (3d Cir 1958) (trial court refused to admit 38 of 45 other accidents involving Bonanza aircraft. "To hold the aircraft responsible on such evidence would be utterly to disregard the factor of human fallibility known inevitably to occur in such circumstances and would be patently unjustified."); *Johnson v. Amerco, Inc.*, 87 Ill App

3d 827, 42 Ill Dec 684, 409 NE2d 299, 315-16 (1980) (The plaintiff attempted to introduce reports of 1,000 prior accidents involving U-Haul trailers overturning. "The complexity of factors bearing upon the issue of whether a trailer is unreasonably dangerous under a certain set of conditions made it impossible to ascertain from the sketchy information provided in the reports which of the prior occurrences was sufficiently comparable to the Johnson accident. In addition, an examination of individual reports commonly reveals * * * either silence or dissimilarity concerning essential factors such as how the trailer was loaded, the size and nature of the tow vehicle, the type of hitch, as well as other factors.").

Exhibit 31 refers to other accidents and states:

"After reviewing 169 cases, two main problems seen in the majority of ATV accidents seem to continue to be 1) instability — as documented in flipover, turnover, rollover on uphill or when hitting a rut, bumps, etc., and 2) difficulty of controlling the 3 wheel design — as seen in rollover when attempting to turn quickly on a flat or hilly surface, and or a paved or gravel surface. These patterns have repeatedly occurred in accidents and deaths, whether alcohol, riding double or speeding were present or not, and for all ages of drivers. Also, although some victims were first time ATV users, half had ATV experience, and also were experienced with motorcycles or minibikes."

It was error to receive any part of Exhibit 31. The references to the accidents referred to therein contain no information concerning any specific accident. For the same reasons, the evidence of other accidents contained in Exhibits 20 and 21 should not have been received. Neither exhibit meets the relevance requirement that the other accidents be substantially similar.

The majority concludes:

"Second, defendants contend that the accidents that were referred to or described in the CPSC documents were not 'substantially similar' to the accident that caused plaintiff's injury here. Again, we disagree with defendants' contention. One of the excerpts at issue concerned reports of the instability of ATVs as a class. Another concerned reports showing a 'pattern of loss of control' specifically associated.

with ATVs manufactured by Honda. Three excerpts concerned reported incidents in which ATVs overturned backward, and three others more specifically concerned incidents in which ATVs overturned backward while climbing hills. As noted, the ninth excerpt concerned the similarity in configuration among all brands of ATVs. The trial court was entitled to find that the prior occurrences that were described in those excerpts were sufficiently similar to the accident at issue in this case to make those occurrences relevant." 316 Or at 268.

The CPSC documents provide *no* details concerning the prior accidents. The most that can be said is that some involve "rearward flips." That is not enough.

Beyond this, I maintain that the exhibits offered to establish that prior similar accidents had occurred are hearsay. The party offering evidence of other accidents has the burden of establishing that the other accidents "occurred under similar conditions and circumstances." *Rader v. Gibbons and Reed Co., supra*, 261 Or at 359. The "other accidents" rule rests on the premise that the other accidents *happened*. The theory is that the *happening* of other accidents of which defendant is aware is admissible to prove notice to defendant. In truth, this evidence was offered to prove that the other accidents had *happened*. The jury, in weighing this evidence, would consider *how* the other accidents had occurred. How similar were the other accidents?

That brings me to the second category of evidence contained within these nine exhibits — opinions of various CPSC personnel concerning the design or safety of ATVs. Exhibit 28 is the most prejudicial. It is a memorandum from a person named Harvey Tzuker to Nick Marchica, neither of whom are otherwise identified in the record, either as to their job or responsibilities, their education or training, or as to their qualifications. The memorandum states:

"The front end of the vehicle is relatively light and acceleration on hills can cause the front wheel to lift, tipping the machine over backwards onto the operator. * * *

"* * * * *

"Conclusion, the more than tripling of projected nationwide ATV associated injuries, their relative severity, the rate

at which accidents are occurring and the ever widening knowledge of fatal incidents are all alarming and ominous.

"It is the opinion of this directorate, based on the data in our files, as well as information from other sources, that three-wheeled all-terrain vehicles may present one of the most significant and explosively growing product hazards ever considered by this agency."

Exhibit 23 is a similar document, a memorandum from Victoria R. Brown and Roy W. Deppa to Elizabeth Haught. As with Exhibit 28, the record is silent concerning their responsibilities or qualifications. The exhibit reads:

"Based upon our examination of the incidents and the machines, Engineering Sciences is of the opinion that the dynamic stability characteristics of the ATV comprise the single most prominent factor identifiable as a cause of loss of control."

There were extensive on-the-record discussions concerning documents such as these. Specifically concerning Exhibit 28, these discussions occurred:

"THE COURT:  * * * This conclusion is rather potent language, and I'm sure the defendants are concerned about it. Now, we're talking about notice, and we're trying to say the plaintiffs argue that this comment is notice of the problems this plaintiff has alleged existed in their complaint. It doesn't relate to any plaintiff's allegation. It's a broad conclusion re type of observation about ATV-associated injuries.

"* * * * *

"THE COURT:  It would be my view * * * that the probative value on notice, if any, of that comment, could only relate to your claim for punitive damages, because I would think that its only value it has, it doesn't give notice in the context of the court's analysis or rulings, but it may be a basis to argue to the jury, after receiving this notice, they continued to or did nothing, continued to put these things on the market, et cetera, et cetera.

"I'm having real difficulty with that conclusionary comment. You know, you never — I'm just kind of thinking out loud — you'd never under certain circumstances, for example, well I'm too strong, but I think it would be very difficult to get that kind of testimony from any kind of witness under any circumstances, and my letting it in through kind of a back door approach — and next level of consideration is, you

know, this is — if there ever was anything inflammatory, this is it, but it may be relevant to punitives.

"* * * * *

"THE COURT:     * * * You know, how do you — how does one really know that this writer is making that damning conclusion that emotional indictment, based on lack of stability, which is your whole theme?

"Now, I grant you, and I acknowledged earlier that you do have the paragraph which refers to stability, and that's why I'm just not outright saying no, I'm agonizing over that tenuous connection, and it is tenuous.

"[PLAINTIFF'S LAWYER]:     I don't think I understood your concern until just now.

"THE COURT:     All right.

"This writer, the man or woman who made this statement is making a harsh opinionated indictment. Just follow me step by step, and let [defense counsel] take care of his own problems.

"How does a person, a jury who's going to hear you read this, know that this person is referring to lack of stability as distinguished from possibly a defective gas tank?

"[PLAINTIFF'S LAWYER]:     My first thought in response to that is the context of this document. The second thought is the context of all the documents, and all we know from all the documents about the nature of the investigation CPSC conducted.

"THE COURT:     I just don't accept that argument. You just can't say: Judge, you have to look at all these documents. This document has to stand on its own four feet, or two feet, or how many feet it's got. My similes get twisted here after a while.

"[PLAINTIFF'S LAWYER]:     May I refer the court back to the earlier portions of the documents which admittedly aren't highlighted or proposed for submission to the jury at this point, but this is a document which spends three pages talking about hospital data and evidence, epidemiological evidence of accidents involving ATVs, and then specifies some preliminary findings about the nature of those accidents, one of which we highlight, and then draws this conclusion. It's — I don't think there can be two interpretations to the general source of this conclusion. It is clearly related to the stability issue of ATVs. They refer to the rate at which accidents are occurring in this paragraph.

"THE COURT: Well, I'm going to waffle, at least until I tell you to the contrary, and I'm sorry if it disrupts your case, it's going to have to disrupt your case.

"At this stage of the trial, and I'm not indicating any concept in my mind, I'm simply saying I want to think and sleep on this last paragraph, so you can use the paragraph on three, but until I instruct you to the contrary, the language in the paragraph conclusion will not be brought to the jury's attention."

The trial judge later made this comment concerning the conclusions in Exhibit 28:

"About Plaintiff's 28, that one-page conclusion that I have under advisement, [plaintiff's lawyer], if you are telling me now, 'Judge, it's critical to our case that we include that ruling, that comment to the jury at this time,' I'm going to admit it. It's your lawsuit.

"I think sometimes you have to share — although I have the ultimate responsibility, I would feel more comfortable if we could defer disclosing that to the jury.

"I think it's that category of evidence which has to be labeled as a real close call. So you have — I'm not going to interfere with a trial lawyer's tactical decisions. If you think it's critical, you can do so. But I would much prefer this matter be looked at."

Plaintiff opted to include Exhibit 28, and it was received.

The majority concludes that this opinion evidence is not within the hearsay definition of OEC 801(3), because it was not offered "to prove the truth of the matter asserted." The evidence ostensibly was offered to show that defendants had notice that the writers of the memoranda had expressed opinions such as (I quote from Exhibit 28) "three-wheeled all-terrain vehicles may present one of the most significant and explosively growing product hazards ever considered by this agency." The question is: Are opinions of persons contained in government records concerning the safety of a product admissible in evidence to establish that the manufacturer of a product is on notice of the dangerousness of the product? I would hold that such opinions, offered under the circumstances in this case, are not admissible.

I begin with an elementary but important proposition. All evidence must rest on a foundation. The most

common foundation is the direct knowledge of the witness who is testifying, knowledge based on actual experience — "I saw the accident." An expert's basis for knowledge, whether expert testimony or other testimony, whether offered as direct evidence, as impeachment, or otherwise, must rest on a foundation of reliability.

The foundation of reliability for eyewitness testimony is, "I perceived it." "There is a rule, more ancient than the hearsay rule, * * * that a witness is qualified to testify to a fact susceptible of observation, only if it appears that he had a reasonable opportunity to observe the facts." 2 McCormick, Evidence 99, § 247 (1992). True, some evidence reposes on other foundations of reliability. Business records are a good example.

> "Unusual reliability is furnished by the fact that regularly kept records typically have a high degree of accuracy. The very regularity and continuity of the records are calculated to train the recordkeeper in habits of precision * * *.

> "The common law exception had four elements: (1) the entries must be original entries made in the routine of a business, (2) the entries must have been made upon the personal knowledge of the recorder or of someone reporting the information, (3) the entries must have been made at or near the time of the transaction recorded, and (4) the recorder and the informant must be shown to be unavailable. If these conditions were met, the business entry was admissible to prove the facts recited in it." 2 McCormick, *supra*, at 264-65, § 286 (footnote omitted).

The admissibility of government records similarly rests on a foundation of reliability. *See United States v. Meyer*, 113 F2d 387 (7th Cir) (a map was properly received into evidence because it was compiled from records of the U.S. Corps of Engineers, the witness was in charge of that office, and the men who furnished the information were working under the witness' control), *cert den* 311 US 706 (1940).

These CPSC records ostensibly were not offered under OEC 801(3) to prove the truth of the matters asserted in the record. Plaintiff disclaims reliance on OEC 803(8). What, then, is the foundation for the receipt into evidence of the opinions contained in these records? There has to be *some* foundation for all evidence.

Even though the majority disclaims reliance on OEC 803(8), it is relevant to our inquiry for reasons that follow. OEC 803(8) provides:

"The following are not excluded by OEC 802, even though the declarant is available as a witness:

"* * * * *

"(8)  Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth:

"(a)  The activities of the office or agency:

"(b)  Matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding however, in criminal cases matters observed by police officers and other law enforcement personnel; or

"(c)  In civil actions and proceedings and against the government in criminal cases, factual findings, resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."

Plaintiff claims, and the majority concludes, that OEC 803(8) does not apply because the records were not offered to establish the truth of the matter asserted.[3] But all of the documents *are* government records. I look to OEC 803(8) for its policy concerning limitations on the use of government records. The public policy of Oregon is clear concerning opinions in government records: Opinions of government employees contained in government records are not admissible.

The commentary to OEC 803(8) states in part:

"The Legislative Assembly intends that this paragraph not provide a sweeping exception for public records containing evaluations or opinions. 'Factual findings' is to be strictly construed to allow as evidence only those reports, otherwise in accord with the rule, which are based on firsthand observation by the public official making the report."

The commentary makes two things clear. One is that the factual findings must be "based on firsthand observation by the public official making the report." The second is that

---

[3] But as will be discussed below, there is another hearsay aspect of this evidence that the majority has not considered.

there is no "sweeping exception for public records containing evaluations or opinions."

The reasons for this conclusion of the drafters of the Oregon Evidence Code are these:

"The first danger posed by Rule 803(8)(C) is the use of a fact finding in a public report without an opportunity for the opponent to cross-examine the reporter to determine the basis for the finding. One justification for the use of such fact findings is that public officials are objective and sufficiently responsible to include fact findings in their reports only if based on reliable information. In our adversary system, however, this assertion should be tested. For example, it is reasonable to expect that jurors could more effectively assess the reliability of a fact finding if they knew the background, training, and experience of the fact finder. Such information is unlikely to appear in a public report and would certainly not be revealed to the extent that it could be through cross-examination. Juries are likely to benefit even more from knowing specifically how the public reporter arrived at the finding. Even if such an explanation appears in the report, without cross-examination the opponent would have little or no opportunity to demonstrate weaknesses in the fact finder's methodology or to suggest better procedures that could have been employed.

"An even greater problem arises when reports are admitted containing conclusions based in whole or in part upon the observation or information of third parties. Such information may not possess any guarantees of trustworthiness that customarily underlie the hearsay exceptions, yet still form the basis for a fact finding admitted under Rule 803(8)(C)." Grossman & Shapiro, *The Admission of Government Fact Findings Under Federal Rule of Evidence 803(8)(C): Limiting the Dangers of Unreliable Hearsay*, 38 U Kan L Rev 767, 771-72 (1990) (footnotes omitted).

Those reasons are applicable, as well, to opinions in government records offered to prove notice. Cross-examination is no less important concerning evidence to prove notice.

The majority confidently states that "[d]efendants' hearsay objections were not well taken, because the excerpts from the CPSC documents were not offered to prove the truth of the matters asserted therein." 316 Or at 269. There is a problem with this conclusion, because the documents that

contain the opinions of CPSC personnel, like the documents concerning other accidents, have a hearsay aspect that renders them inadmissible.

Exhibit 28 is illustrative. The effect of admitting Exhibit 28 is to say: CPSC is an agency of the United States. Nick Marchica works for CPSC.[4] Nick Marchica has an opinion concerning ATVs. He wrote to another CPSC employee, "three-wheeled all-terrain vehicles may present one of the most significant and explosively growing product hazards ever considered by this agency." The jury was instructed that this statement was admissible only for the purpose of giving notice to the defendants "that the ATVs could overturn."

It may be true that Exhibit 28 was not offered to prove that "three-wheeled all-terrain vehicles present one of the most significant and explosively growing product hazards ever considered by this agency." But the document offered was the *opinion* of a CPSC *employee*, Nick Marchica, and it was *received* as the opinion of a CPSC employee having knowledge of ATVs, received with no opportunity for cross-examination concerning the basis for the opinion. No one could deny that this document, even as limited by the trial court's instructions, had immensely more weight than would an opinion from some unidentified third person. Why does it have more weight? Because it is an opinion of one having knowledge of ATVs, a CPSC employee. I concede that the document, as offered and received, had but one nonhearsay aspect — to prove that defendants were on notice that a person had told them that ATVs were dangerous. The document has several hearsay aspects: that Nick Marchica had knowledge on which to base his opinion, that Nick Marchica was a CPSC employee, and that this was Nick Marchica's opinion.

In order for the jury to consider whether the CPSC documents did provide "notice" to defendants, the jury must evaluate the reliability of the statements in those documents. In determining reliability, the jury implicitly will consider two things: (1) Does the out-of-court declarant have knowledge about the subject; and (2) is the statement of the out-of-

[4] Exhibit 20 refers to Mr. Marchica as "Program Manager for Product Safety."

court declarant likely to be viewed by defendants as truthful? In considering this second step, the jury must necessarily inquire into the "truth of the matter asserted."

The opinion in Exhibit 28 was addressed to the very question that the jury was required to decide: Were defendants' ATVs unreasonably dangerous? The trial judge opined that "it would be very difficult to get that kind of testimony from any kind of witness under any circumstances * * *, this is — if there ever was anything inflammatory, this is it * * *."

Professor Wigmore states that cross-examination "is beyond any doubt the greatest legal engine ever invented for the discovery of truth. * * * [C]ross-examination, not trial by jury, is the great and permanent contribution of the Anglo-American system of law to improved methods of trial procedure." 5 Wigmore, Evidence in Trials at Common Law 32, § 1367 (1979). Jones states that "the real basis of weakness [of hearsay] lies in the fact that the absent person, whose assertion is offered to prove the facts he asserts, is not subject to the testing process of cross-examination to reveal weaknesses in his perception, his memory and his integrity." 2 Jones on Evidence 166, § 8:2 (1972). Mr. Tzuker was not available for cross-examination concerning his basis of knowledge, his employment, and his experience and training.

The public policy stated in the commentary to the Evidence Code is clear — opinions of government employees contained in government records are not admissible. It may be that an expert would be permitted to express an opinion such as is contained in this exhibit, if the expert were available for cross-examination. *See* OEC 704 (expert testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact). However, those opinions are patently untrustworthy and thus their relevance, even for the purpose of notice, is greatly reduced. I would hold that such records are not admissible for any purpose.

To the best of my knowledge, no court has upheld the admissibility of opinion evidence like that contained in Exhibits 28 and 23 when offered as part of a government record. OEC 602 provides:

"Subject to the provisions of OEC 703, a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness."

The effect of admitting Exhibit 28 was to permit Nick Marchica to testify without being present, and with no opportunity to cross-examine.

My decision on the remaining five exhibits is:

Exhibit 25 is a memorandum from William Walton to the commission. It raises "questions about CPSC-investigated (IDI's) death and injury incidents." However, the memorandum provided no details of those incidents. Nor does it contain any admissible factual findings.

Exhibit 120 refers to previous ATV accidents, without providing any details regarding the circumstances under which those accidents occurred. As is the case with all the exhibits mentioned above, this is the very type of evidence to be excluded by the rule in *Rader*. Absent any showing of the circumstances surrounding the accidents referred to in these exhibits, evidence of those accidents is not relevant. Nor do these exhibits contain any admissible factual findings.

Exhibit 122 does not refer to any prior accidents. Because it was offered to prove defendants' knowledge that ATV's could overturn backwards, and was not offered to prove the truth of the matter asserted, it is admissible.[5]

Most of the exhibits set forth in the Appendix are not admissible for any purpose, either as evidence of relevant "other accidents" or otherwise.

On the punitive damages question, I disagree with the majority. I read the Supreme Court decision in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 US 1, 111 S Ct 1032, 113 L Ed 2d 1 (1991), to require three due process procedural protections:

1. At trial, the jury must have adequate guidance by instructions, so that its award is reasonable, and not

---

[5] Portions of Exhibit 37 may be admissible. Exhibit 121 appears to refer to some other report ("The ARTECH report"). It should not have been received.

a product of "unlimited jury discretion." 111 S Ct at 1044. "As long as [the jury's] discretion is exercised within reasonable constraints, due process is satisfied." *Ibid.*

2. The state must establish post-trial procedures for trial court review of punitive damages awards to ensure "meaningful and adequate review by the trial court." *Ibid.*

3. The state must establish post-trial appellate review procedures. "This appellate review makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Id.* at 1045. It also ensures "that punitive damage awards are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages." *Ibid.*

The majority appears to require no post-verdict review procedures.

I would reverse the trial court and the Court of Appeals. I therefore dissent.

# APPENDIX

Plaintiff's lawyer read the following exhibit excerpts to the jury:

## EXHIBIT 20

"United States Government Memorandum

U.S. Consumer Product Safety Commission Washington, D.C. 20207 Date: 09 JUL 1984

"TO:     The Commission
\* \* \*

"FROM:     Nick Marchica, Program Manager for Product Safety Commission, Office of Program Management

"SUBJECT:     All-Terrain Vehicles (ATVs)

"\* \* \* \* \*

"Stability is of concern. The handling characteristics are peculiar to the ATV and are distinctly different compared to a two-wheeled vehicle. Considerable practice is required to master 'all-terrain' use. However, a beginner may readily ride the ATV on gentle terrain, due to the static stability of the tricycle configuration.

"\* \* \* \* \*

"In reviewing 40 in-depth investigations of ATV accidents from January 1981 through March 1984, several hazard patterns were identified:

"• Flipover or Rollover — Thirty-four cases resulted from rollover or tipover of the vehicle. In 13 of the rollover cases the injuries were serious and included concussions, eye injuries and fractured shoulders. Contact with the handlebars during rollover contributed to several cases of fractured skull, face, or jaw.

"*Medical Opinion*

"The Medical Director's opinion is that there is a lack of comprehension of the complexity of the vehicle's actual performance characteristics and the consequent inherent dangers. This is due to two factors: the deceptive impression of stability given by a tricycle type vehicle with a wide tread and broad wheels, and the agility of the vehicle which is advertised frequently as showing the vehicle in flight, operating at high speeds and performing complex maneuvers."

## EXHIBIT 23

"United States            U.S. Consumer Product
Government               Safety Commission
Memorandum              Washington, D.C. 20207
                        Date: 11 FEB 1985

"TO:          Elizabeth Haught, CACA
              * * *

"FROM:        Victoria R. Brown, ESHF and Roy W.
              Deppa, ESES

"SUBJECT:     Assessment of the Specialty Vehicle Insti-
              tute of America Proposed Rider Training
              Program for All Terrain Vehicles

"* * * * *

"* * * Based upon our examination of the incidents and the machines, Engineering Sciences is of the opinion that the dynamic stability characteristics of the ATV comprise the single most prominent factor identifiable as a cause of loss of control."

## EXHIBIT 25

"United States            U.S. Consumer Product
Government               Safety Commission
Memorandum              Washington, D.C. 20207
                        Date: 29 MAR 1985

"TO:          The Commission
              * * *

"FROM:        William W. Walton, AED, ES

"SUBJECT:     Forwarding of ATV Meeting Log.
"* * * * *

"*SUBJECT*:   Design and Development of the Honda
              ATC[*]

"* * * * *

"*Note that ATC (All Terrain Cycle) is the Honda trademark name of the device more generally referred to as the All Terrain Vehicle (ATV).
"* * * * *

"*Discussion of ATV Safety*

"The dialogue dealt at some length on safety considera-tion in the design of the ATC, with specific question raised as to the extent of those considerations encompassed in the

development process. Specifically, we raised questions about CPSC-investigated (IDI's) death and injury incidents. The emerging awareness by the Engineering Sciences staff that a common pattern of loss of control due to the dynamic characteristics of the ATV was described."

## EXHIBIT 28

"United States   U.S. Consumer Product
Government     Safety Commission
Memorandum    Date: MAR 20 1985

"TO:     Nick Marchica, EX-P
       * * *

"FROM:    Harvey Tzuker, EPHA

"SUBJECT:   Further Information on All Terrain Vehicles (ATVs)

"• The front end of the vehicle is relatively light and acceleration on hills can cause the front wheel to lift, tipping the machine over backwards onto the operator. * * *

"* * * * *

"Conclusion, the more than tripling of projected nationwide ATV associated injuries, their relative severity, the rate at which accidents are occurring and the ever widening knowledge of fatal incidents are all alarming and ominous.

"It is the opinion of this directorate, based on the data in our files, as well as information from other sources, that three- wheeled all-terrain vehicles may present one of the most significant and explosively growing product hazards ever considered by this agency."

## EXHIBIT 31

"United States   U.S. Consumer Product
Government     Safety Commission
Memorandum    Date: February 11, 1985

"TO:     Nick Marchica, EX-P
       * * *

"FROM:    George Rutherford, EPHA
       Jean Kennedy, EPHA

"SUBJECT:   Updated Injury Data on All Terrain Vehicles

"* * * * *

*"DISCUSSION*

"After reviewing 169 cases, two main problems seen in the majority of ATV accidents seem to continue to be 1) instability - as documented in flipover, turnover, rollover on uphill or when hitting a rut, bumps, etc., and 2) difficulty of controlling the 3 wheel design - as seen in rollover when attempting to turn quickly on a flat or hilly surface, and or a paved or gravel surface. These patterns have repeatedly occurred in accidents and deaths, whether alcohol, riding double or speeding were present or not, and for all ages of drivers. Also, although some victims were first time ATV users, half had ATV experience, and also were experienced with motorcycles or minibikes."

## EXHIBIT 37

"Federal Register / Vol. 50, No. 105 / Friday, May 31, 1985 / Proposed Rules

"CONSUMER PRODUCT SAFETY COMMISSION

"* * * * *

"All-Terrain Vehicles; Advance Notice of Proposed Rulemaking; Request for Comments and Data

"Agency:    Consumer Product Safety Commission

"Summary:    Based on available data, the Commission has preliminarily determined that there may be an unreasonable risk of injury associated with the use of all-terrain vehicles (ATVs) which may be sufficiently severe to require regulatory action by the Commission. The commission is aware of at least 161 deaths associated with ATVs occurring between January 1982 and April 1985. Estimates on the number of hospital emergency room treated injuries associated with ATVs in 1984 was 68,956. This is almost two and one-half times the number of injuries in 1983 and more than seven times the number in 1982. An estimated 28,000 ATV related injuries were treated in hospital emergency rooms nationwide in the first four months of 1985. This is approximately 80 percent higher than the estimated injuries treated during the same time period in 1984. The Commission is primarily concerned about accidents which result from (1) loss of control of the vehicle; (2) the vehicle overturning, such as flipping over backward, tipping over forward, or rolling over sideways; and (3) the rider being thrown from the ATV after it hits bumps, ditches, and other terrain features. [Footnote omitted.]

"* * * * *

"* * * The Commission is concerned about whether the performance characteristics of three and four wheel ATVs, including their dynamic stability and handling, are reasonably safe. The Commission's technical staff has not determined the feasibility, practicality, appropriateness, or cost of performance or other modifications, which would adequately reduce or eliminate the risk of injury associated with ATVs. However, based on available data, the Commission staff believes that the performance characteristics of ATVs, including their dynamic stability and handling, are a significant factor in ATV related accidents.

"* * * * *

"* * * Overturning and loss of control were documented in the majority of reported ATV deaths.

"D.   Engineering Information

"The basic configuration of the ATV and its unique performance characteristics, including dynamic stability and handling, appear to play a major role in accidents involving ATVs. Many of the serious-injuries and deaths reported in the in-depth investigations resulted from loss of control of the ATV and were observed regardless of whether alcohol, riding double, or speeding were also observed. These incidents involved drivers of all ages. Also, although some victims were first time ATV users, many had previous experience riding ATVs, and experience riding motorcycles or minibikes."

EXHIBIT 120

| "United States Government Memorandum | U.S. Consumer Product Safety Commission Date: 5/1/84 |
|---|---|

"TO:          Nick Marchica, Program Management
              * * *

"FROM:        Albert F. Esch, M.D.
              Medical Director

"SUBJECT:     All Terrain Vehicles, (ATVs)

"* * * * *

"As indicated in the reports prepared by Epidemiology, The common mechanisms that appear to be associated with

the severe injuries are the dislodgment of the operator from the vehicle while it is in motion, and/or the overturning of the vehicle with consequent entrapment and crushing injuries to the driver. * * *

"* * * [T]here appears to be common lack of understanding or comprehension of the complexity of the vehicle's actual performance characteristics; and its consequent inherent dangers. This could be due in part to the deceptive impression given by a comfortable appearing, tricycle type vehicle, with a wide tread and broad wheels which would seem to assure stability. Such confidence might be furthered by the erroneous image of the vehicle's implied agility * * *.

"* * * * *

"The nature of the risk therefore can be characterized as circumstances in which there is a deceptively dangerous vehicle, (possibly mistermed *All* Terrain within reasonable constraints of safe operation), requiring a high degree of skill and insight into its performance for proper control, utilized by a cross section of ages. As with aircraft, these vehicles can be unforgiving of minor errors in judgement and consequent accidents usually result in major injuries."

## EXHIBIT 121

"United States Government Memorandum

U.S. Consumer Product Safety Commission
Date: 3 MAY 1984

"TO:        Elizabeth Haught, CACA
              * * *

"FROM:     Roy Deppa, ESES
              Medical Director

"SUBJECT:   * * * Review of Information Relating to Mechanical Characteristics of All Terrain Vehicles (ATV's)

"* * * * *

"The ARTECH report reveals that the three-wheeled ATV's currently being marketed are very similar in configuration, and there is little variation either between brands or from year to year. * * *"

## EXHIBIT 122

"U.S. Consumer Product Safety Commission
Washington, D.C. 20207
(202) 634-7710

"RECEIVED
APR 30 1985

"TO: ALL MEDIA (News Directors, Consumer Reporters, Action-Line Columnists, Editorial Page Editors)

"RE: *Rising Death & Injury Toll from All-Terrain Vehicles (ATVs)*

"* * * * *

"*CAUSES.* At this time, Commission staff identify two underlying problems in ATV-related *accidents*. These involve: (1) instability of the vehicle (causing flipovers, turnovers, and rollovers when an ATV is moving uphill or hits a rut or bump); * * *. Variables which appear to have contributed to incidents, or their severity, include: riding surface, speed, alcohol involvement, additional passenger, nighttime use, and lack of helmet.

"An in-depth review of hazard patterns involved specifically in ATV-related *fatalities* revealed three basic scenarios: * * * (2) tipover/flipover/rollover (vehicle flipped backwards ascending a hill, tipped over frontwards, descending a hill, or rolled over sideways while turning); * * *." (Emphasis in original.)