14

Argued and submitted November 8, 2006, affirmed April 11, 2007

WAH CHANG,
*Plaintiff-Respondent,*

*v.*

PACIFICORP,
*Defendant-Appellant.*

Linn County Circuit Court
002578; A123961

157 P3d 243

Robert L. Aldisert argued the cause for appellant. On the opening brief were Lawrence H. Reichman, Jay A. Zollinger,

Jeffrey C. Dobbins, and Perkins Coie LLP. On the reply brief were Jay A. Zollinger and Perkins Coie LLP.

Thomas W. Sondag argued the cause for respondent. With him on the briefs was Lane Powell PC.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

HASELTON, P. J.

**HASELTON, P. J.**

Defendant appeals the trial court's order granting plaintiff relief from judgment. ORCP 71 B(1). Originally, plaintiff sought a declaratory judgment declaring that it has no further obligations to purchase electricity from defendant under the parties' contract. Plaintiff alleged, *inter alia*, that the primary purpose of that contract had been frustrated by an unanticipated event. The trial court granted defendant's motion for summary judgment, and, nearly a year after the entry of judgment, plaintiff sought relief under ORCP 71 B. Specifically, plaintiff proffered "newly discovered evidence" pertaining to its claim of "frustration of purpose" that, plaintiff asserted, would "probably change the result," *viz.*, the allowance of summary judgment. The trial court determined that plaintiff's new evidence presented disputed issues of material fact pertaining to "frustration of purpose" and granted the requested relief. We affirm.[1]

■■ Because of the complex procedural posture, we begin by explaining our standard of review. Generally, we review the allowance of relief pursuant to ORCP 71 B for abuse of discretion. *National Mortgage Co. v. Robert C. Wyatt, Inc.*, 173 Or App 16, 18, 20 P3d 216, *rev den*, 332 Or 430 (2001). Among other things, a court must consider whether the proffered "newly discovered evidence" "will probably change the result" of the previous judgment. *See Oberg v. Honda Motor Co.*, 316 Or 263, 272, 851 P2d 1084 (1993), *rev'd on other grounds*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994).[2]

Here, the previous judgment is the trial court's grant of summary judgment. Summary judgment is proper if the

---

[1] After the trial court's entry of judgment, plaintiff appealed, assigning error to the allowance of summary judgment. *Wah Chang v. PacifiCorp*, A119758. That appeal was stayed pending the resolution of plaintiff's ORCP 71 motion. Later, we declined to consolidate the two appeals and eventually dismissed the first appeal as "moot." Plaintiff, in this appeal, "cross-assigns" error to the trial court's allowance of summary judgment. Because of our disposition of this case, we do not address that "cross-assignment."

[2] *Cf. State v. Farmer*, 210 Or App 625, 640, 152 P3d 904 (2007) (addressing application of "abuse of discretion" standard of review to allowance of new trial pursuant to ORCP 64 B(4), based on "newly discovered evidence"); *Mitchell v. Mt. Hood Meadows Oreg.*, 195 Or App 431, 457-59, 99 P3d 748 (2004) (same).

"pleadings, depositions, affidavits, declarations and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment *as a matter of law*." ORCP 47 C (emphasis added).

> "No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment."

*Id.* In reviewing the allowance of summary judgment, we draw all reasonable inferences in favor of the nonmoving party. *West v. Allied Signal, Inc.*, 200 Or App 182, 187, 113 P3d 983 (2005).

Because we must consider whether the trial court erred in determining that the "newly discovered evidence" will change the "result"—the prior allowance of summary judgment—we view both the evidence in the summary judgment record and the new evidence in the light most favorable to plaintiff. That is, we view the former most favorably to plaintiff as the nonmovant on summary judgment, and the latter most favorably to plaintiff as the proponent of ORCP 71 B relief. We then determine whether, even with the evidence so viewed, defendant nevertheless remains entitled to judgment, which would render the trial court's allowance of ORCP 71 B relief an abuse of discretion. *Accord State v. Johnson*, 199 Or App 305, 311-12, 111 P3d 784, *rev den*, 339 Or 701 (2005) (a court's discretion is limited to "the range of legally acceptable options"); *Mitchell v. Mt. Hood Meadows Oreg.*, 195 Or App 431, 457-59, 99 P3d 748 (2004) (addressing application of "abuse of discretion" standard of review in analogous context). We proceed to describe the material facts consistently with that standard of review.

## I. MATERIAL FACTS AND PROCEDURAL BACKGROUND

### A. *Contract Formation and Performance*

Plaintiff Wah Chang manufactures specialty metals and chemicals at its plant in Millersburg, near Albany. Electricity is the Millersburg plant's second highest operating

cost, and it has purchased its electricity from defendant PacifiCorp since 1956.

The Oregon Public Utilities Commission (PUC) requires utilities, such as defendant, to maintain consistent rates, set forth in tariffs, for all of their customers.[3] In order to deviate from tariff rates, contracting parties must receive the PUC's approval of a "special contract."[4] Historically, plaintiff purchased electricity from defendant according to the prices set forth in defendant's standard tariff rate for large industrial customers—Rate Schedule 48T. However, in 1997, dissatisfied with that rate, plaintiff began looking into other options and found that it could purchase electricity for a five-year period through a relationship with the City of Millersburg, at a rate lower than defendant's tariff rate.

Ultimately, however, plaintiff also desired to continue its longstanding relationship with defendant. To that end, instead of pursuing the City of Millersburg option, plaintiff and defendant negotiated a "special contract" to submit for approval to the PUC. That contract, known as the Master Electric Service Agreement (MESA), is the subject of this case.

---

[3] *See* ORS 757.310, which provides, in part:

"(1) A public utility may not charge a customer a rate or an amount for a service that is different from the rate or amount prescribed in the schedules or tariffs for the public utility.

"(2) A public utility may not charge a customer a rate or an amount for a service that is different from the rate or amount the public utility charges any other customer for a like and contemporaneous service under substantially similar circumstances."

[4] *See* OAR 860-022-0035, which provides, in part:

**"Special Contracts**

"(1) Energy and telecommunications utilities within Oregon entering into special contracts with certain customers prescribing and providing rates, services, and practices not covered by or permitted in the general tariffs, schedules, and rules filed by such utilities are in legal effect tariffs and are subject to supervision, regulation, and control as such.

"(2) All special agreements designating service to be furnished at rates other than those shown in tariffs now on file in the Commission's office shall be classified as rate schedules. True and certified copies shall be filed subject to review and approval * * *."

(Boldface in original.)

In negotiating the MESA, plaintiff requested a five-year fixed price at a rate lower than Schedule 48T. Defendant, unwilling to predict its own operating costs that far into the future, would not agree to a fixed price for a full five years. Consequently, the parties negotiated a deal calling for a three-year fixed rate, followed by a two-year variable rate.

The parties agreed that the two-year variable rate would be based on a published index of market prices. After discussing various indexes as options, the parties chose an index of market prices at the California-Oregon border published in the *Wall Street Journal*, commonly known as the "Dow Jones COB" index (the Dow COB index).[5] The variable rate was then calculated by adding a set amount (the "adder") to the published Dow COB index price.

In an affidavit submitted in opposition to summary judgment, Robert McCullough, an expert on energy markets, explained the operation of the Dow COB index as follows:

"Utilities in the Pacific Northwest sell and buy [electricity] with counterparties in California and the Southwest, among others. The parties to these transactions often specify a substation near the Oregon-California border as the point of delivery. These transactions have come to be known in the industry as occurring 'at COB.' Beginning in 1995, the Dow Jones Company began collecting price and volume information about certain transactions at COB. Dow Jones receives average prices and aggregate volumes from market participants who have agreed to provide it. Dow Jones averages the prices and aggregates the volumes and publishes the information daily as the Dow COB price index.

"The product reflected in the Dow COB index is a subset of all products traded at COB. Only transactions meeting certain criteria established by Dow Jones are reported. The transactions are purchases and sales agreed upon one day[,] for delivery the next day at COB * * *."

Based on that pricing structure—including using the Dow COB index price as the variable cost benchmark for the contract's final two years—the parties sought the PUC's approval of the MESA. In doing so, defendant submitted a

---

[5] "COB" stands for "California-Oregon Border."

"Technical Assessment Package" explaining the nature of the contract, including the expected rates and profits during each year. In that package, defendant explained that by using the variable rate calculation the parties had chosen (the rate based on the Dow COB index plus the fixed "adder"), it was ensuring profitability over the course of the final two years of the agreement.[6] The PUC approved the MESA, and it went into effect September 1997, to be in effect until September 2002.

During the first three years of the contract, plaintiff enjoyed the benefits of the fixed rate. For example, during the first year, September 1997 through August 1998, plaintiff paid approximately $1.8 million less than it would have under defendant's Schedule 48T tariff rate. However, after the period of fixed rates expired and the variable rate commenced, plaintiff's price for electricity skyrocketed. During the first year under the variable rate, September 2000 through August 2001, plaintiff paid almost $26 million more than it would have under the tariff rate. That year, plaintiff's total electricity bill was approximately $31 million—a 600 percent increase over the previous year. As amplified below, the reasons for those extraordinary prices, and their relationship to the MESA, formed the substance of plaintiff's action and, particularly, its claim of "frustration of purpose."

B. *Plaintiff's Complaint: "Frustration of Purpose"*

In December 2001, with approximately 10 months remaining under the MESA, plaintiff filed its complaint in this case, seeking a declaration excusing it from further performance under the contract. In its complaint, plaintiff described recent regulatory changes in the California electricity market and the effects that those changes had on market prices:

---

[6] ORS 757.230(1)(a) and (b) provide that, in certain circumstances, the PUC, in approving a special contract, must consider whether the proposed rate is "sufficient to cover [the] relevant short and long run costs of the utility" and whether the rate is "sufficient to insure that just and reasonable rates are established for remaining customers of the utility[.]" The parties do not dispute that in approving the MESA, the PUC was required to consider defendant's expected profits over the five years of the agreement.

"[R]estructuring of the California electricity market has proved to be disastrous due to serious market design flaws and behavior of market participants that have resulted in extremely high and volatile wholesale bulk power prices in California and elsewhere. By Order dated November 1, 2000, [the Federal Energy Regulatory Commission] addressed 'the seriousness of market dysfunctions and recent price abnormalities in California' and found 'that the electric market structure and market rules for wholesale sales of electric energy in California are seriously flawed and that these structures and rules, in conjunction with an imbalance of supply and demand in California, have caused * * * unjust and unreasonable rates for short-term energy * * * under certain conditions.' Further, while [the Federal Energy Regulatory Commission] was not then able to reach definite conclusions about the actions of individual sellers, it concluded that 'there is clear evidence that the California market structure and rules provide the opportunity for sellers to exercise market power when supply is tight and can result in unjust and unreasonable rates * * *.' "

Essentially, plaintiff alleged that, because of recent regulatory changes in the California energy market and the behaviors of market participants within that regulatory system, market prices, as reflected in the Dow COB index, were fantastically higher than expected. Based on those facts, plaintiff alleged "mutual mistake," "frustration of purpose," and "commercial impracticability," and sought a judgment declaring that it had "no further obligation to perform under the Agreement." With respect to its "frustration of purpose" claim, plaintiff alleged:

"A purpose of the [MESA] was to permit plaintiff to purchase electricity during the fourth and fifth contract years *at prices determined in a market uncorrupted by design flaws, exercise of market power, price abnormalities and other dysfunctions.* The dysfunctions of the California electric market are supervening circumstances that have frustrated the purpose of the Agreement."[7]

(Emphasis added.)

---

[7] Plaintiff's claims of "mistake" and "impracticability" are not at issue in this appeal. Consequently, we do not discuss them except to the extent they relate to plaintiff's claim of "frustration of purpose."

## C. *The Trial Court Allows Summary Judgment*

■ In February 2002, defendant moved for summary judgment. Before describing the substance of that motion and the trial court's disposition, a brief review of the requisites of "frustration of purpose" (amplified in our analysis below) is useful. The frustration of purpose doctrine allows rescission of a contract if one party's mutually understood "principal purpose" in entering into the contract is "frustrated * * * by the occurrence of an event the non-occurrence of which was a basic assumption" of the parties. *Restatement (Second) of Contracts* § 265 (1981). Thus, to obtain rescission, a party must show that (1) a particular purpose was its "primary purpose" in entering into a contract; (2) that purpose was "mutually understood," even if not mutually shared; (3) that purpose was substantially "frustrated"; and (4) the "frustration" was the result of circumstances that the parties mutually assumed would not occur—and, thus, the risk of the frustrating circumstance was not impliedly allocated to the party who later seeks rescission. *See* 212 Or App at 35-36 (summarizing principles).

As pertinent to this appeal, defendant asserted two alternative reasons in support of its summary judgment motion as directed against plaintiff's claim of "frustration of purpose." *First*, defendant argued that, as a matter of incontrovertible fact, plaintiff's characterization of the "purpose" of the MESA—*viz.*, to allow plaintiff to purchase electricity at prices determined by an uncorrupted market—was incorrect. Rather, defendant claimed that the undisputed purpose of the MESA was to allow plaintiff to purchase electricity at a price "other than" defendant's standard tariff rate—and that, because the MESA's rates had been consistently "different" from Schedule 48T, *that* purpose had not been frustrated.

*Second*, defendant argued that any increase in energy prices, however extraordinary and extreme, could not be a "frustrating event" because, under the parties' contract, the risk of the volatility of the California market, and the risk of consequent high market prices, were allocated to plaintiff. In that regard, defendant asserted:

"[The] purpose [of using a market-based rate] was to transfer the risk of 'price abnormalities' and other market fluctuations from [defendant] to [plaintiff] so that [defendant] would agree to a five-year special contract. * * * [T]his assumption of risk by [plaintiff] precludes [plaintiff] from relying on the doctrine of frustration of purpose."[8]

In response, plaintiff filed a number of affidavits, which plaintiff claimed raised issues of material fact with respect to each of defendant's arguments. First, plaintiff argued that the substance of its affidavits created an issue of fact regarding the "fundamental purpose" of the contract. Plaintiff contended—differently from the allegations of its own complaint, and contrary to defendant's assertion in seeking summary judgment—that the purpose of the MESA "was for [plaintiff] to obtain prices at rates *more favorable than 48T*[.]" (Emphasis added.) Plaintiff submitted at least two affidavits purporting to demonstrate that defendant was aware that plaintiff's purpose in negotiating a new contract was to receive a discount from the Schedule 48T rate, as well as expert opinion demonstrating that the parties' choices in setting the variable rate were influenced by that purpose.

Second, in response to defendant's "allocation of risk" argument, plaintiff asserted that (1) the parties' selection of the Dow COB index was based on certain fundamental assumptions regarding that index's operation; and (2) the parties had not allocated the risk that the Dow COB index would cease to operate in conformance with—and, consequently, would reflect prices bearing no relationship to—those underlying assumptions. In support of those assertions, plaintiff submitted expert testimony from McCullough.

McCullough explained that the transactions "at COB" reported in the Dow COB index are referred to as "day-ahead" transactions. Day-ahead transactions are "load-balancing" transactions—that is, transactions made to "supplement or reduce * * * previously acquired resources as part

---

[8] The parties, as well as the trial court, commonly use the term "assumption of risk." As explained more fully below, the frustration of purpose doctrine relies extensively on the "assumptions" of the parties, as well as the "allocation" of risks, and the two concepts overlap in determining whether to relieve one party of its obligations. Consequently, for clarity, we employ the term "allocation of risk" in our analysis.

of [a] continuing adjustment of resources to meet the load expected for the next day." Because they operate as "load-balancing" transactions (as opposed to specifically profit-generating transactions), "[i]n a properly functioning market, prices in day-ahead transactions can be expected to equal or approach the marginal cost of production of the least efficient generating plant." However, as McCullough further averred, beginning in 1998, California's energy regulations changed—and, because of the new regulatory system, market participants were able to manipulate certain transactions in California. Because of those manipulated transactions, and because of certain aspects of the new regulatory system,[9] "day-ahead transactions in California no longer were load-balancing transactions." Consequently, the day-ahead prices at COB no longer approximated the marginal cost of producing electricity.

McCullough also submitted, as an attachment to his affidavit, a transcript of testimony he gave before the PUC in 2001 regarding the MESA's use of the Dow COB index. In that testimony, McCullough explained that, in his opinion, an index such as the Dow COB index is used because it approximates—and therefore "covers"—the cost of producing electricity. Consistently with that understanding, defendant's profit would come from the "adder"—the set sum added to the price reflected in the index. McCullough also stated that, after reviewing various PUC documents submitted as part of the approval process, including defendant's Technical Assessment Package, it appeared that defendant understood the nature of the Dow COB index and assumed and expected that prices reflected in the index would continue to roughly approximate the cost of production.

Based particularly on McCullough's affidavit and PUC testimony, plaintiff contended that the parties had not,

---

[9] McCullough explained that the new system employed the use of an entity, the Independent System Operator (ISO), that was intended to purchase some small amounts of day-ahead power for the three major private utilities in California. Because of market manipulation by various market participants, which is discussed more fully below, the ISO was forced to become the primary source of supply for the three utilities and also had to purchase at "emergency prices," which were dramatically higher than the normal price of load balancing transactions. Those prices in California affected the prices of the load balancing transactions at COB.

in fact, allocated the risk that the Dow COB index would not accurately reflect the marginal cost of electrical production:

> "[Plaintiff] agreed to use the Dow COB because it tended to reflect the * * * marginal cost of production. Based on its understanding that the Dow COB itself reflected the marginal cost of production, [plaintiff] agreed to pay that cost, plus a charge of $11 per [megawatt hour].
>
> "* * * *While [plaintiff] * * * assumed the risk that such cost might increase as a consequence of various factors, it never agreed to assume the risk that the very index the parties chose would not accurately measure that cost."*

(Citations omitted; emphasis added.)

In March 2002, defendant replied. First, defendant asserted that plaintiff's alleged "purpose" of obtaining rates lower than the Schedule 48T rate was nothing more than a "motive of increasing profits [that] underlies *every* business contract[,]" (emphasis in original)—and that, as such, it could not be the basis of actionable "frustration." Second, defendant argued that plaintiff could not show that the purported "assumptions" about the Dow COB index were, in fact, shared by the parties. Finally, defendant reiterated its general "allocation of risk" argument:

> "[Plaintiff] recognizes that it is 'self-evident that [it] assumed a risk of market variation.'
>
> "* * * * *
>
> "As a matter of law * * * [plaintiff] cannot now successfully argue that it did not assume the *degree* to which market prices actually fluctuated because the terms of the MESA assign the risk of market fluctuations to [plaintiff]. This is especially true in light of the fact that, at the time [plaintiff] entered into the MESA, it was fully aware that the California market was about to undergo significant changes. Despite these imminent changes, [plaintiff] entered into a contract that required it to pay market prices * * *. *By doing so, [plaintiff] assumed the risk that deregulation of the California market would lead to unanticipated fluctuations of electricity prices outside of their historical range. The fact that [plaintiff] did not specifically predict the precise cause or extent of these fluctuations does not alter this conclusion."*

(Citations omitted; first emphasis in original; second emphasis added.)

Meanwhile, in February 2002, the Federal Energy Regulatory Commission (FERC) had initiated an investigation into the behavior of Enron Corporation and other participants in the California energy market during the months following January 2001. In May 2002, FERC released three memoranda (the Enron memos) that described the tactics used by Enron in California during that time. Shortly thereafter, plaintiff moved to supplement the summary judgment record with the three recently released memos. Plaintiff explained how the memoranda supported its frustration of purpose claim:

> "[Plaintiff] contends that, at the time of contracting, the parties were mistaken as to their basic assumption that the Dow COB would reflect the marginal cost of electricity, which mistake came to light after the restructuring of the California market. * * * More particularly, [plaintiff] contends that, because of the manner in which electricity was bought and sold in California, generators underscheduled their electricity supply at the day ahead * * * auction to create artificial electricity shortages. The generators then failed to bid their full capacity in the day ahead market, but rather waited to sell their excess capacity at the emergency prices that would result from the artificial shortages.

> "* * * Due to strategies like these, California's energy crisis was exacerbated. As a result, Dow COB prices soared alongside the California markets. [Plaintiff] contends that impacts from activities such as those outlined in the Enron memoranda brought to light the parties' mistaken assumption * * *."

In addition, in its memorandum in support of the motion to supplement, plaintiff advanced a new argument in opposition to summary judgment: The parties selection of the Dow COB index was also based on the assumption that that index reflected *"actual* sale[s] and purchase[s] of electric power"* (emphasis added), and the proliferation of sham transactions, in which no energy had actually been transferred, had abrogated that assumption. Thus, the failure of *either* the "marginal cost of production" assumption or the "actual sale[s]" assumption served to frustrate the purpose of

the MESA, *viz.*, to produce a price below defendant's Schedule 48T tariff. The trial court granted the motion to supplement the record.

In sum, the parties' positions "morphed" to some extent, and were refined, during the summary judgment process. Ultimately, however, the pleadings and evidentiary submissions framed three overarching questions. *First*, what was plaintiff's fundamental purpose—to pay a price *lower* than the Schedule 48T rate, or merely a price *other than* the tariff rate—and was there a disputed issue of fact in that regard, including whether that purpose was mutually understood?

*Second*, even assuming that plaintiff's fundamental purpose was to pay a price lower than the tariff rate and that defendant understood that purpose, were there disputed issues of fact as to whether that purpose was frustrated by the occurrence of circumstances contrary to fundamental and mutually understood assumptions on which the MESA was predicated? In particular, were there issues of fact as to whether the MESA was based on mutually understood assumptions that the Dow COB index would accurately reflect (1) the marginal cost of electrical production and (2) actual (as opposed to sham) sales of electricity?

*Third*, even assuming that plaintiff's characterization of the underlying assumptions was correct, had the parties contractually allocated to plaintiff the risk of the nonoccurrence of those assumptions? That is, in agreeing to use a market-based index as the variable price referent, had plaintiff contractually accepted the risk that, in the future, the Dow COB index might fail to reflect what it had historically reflected?

The trial court allowed summary judgment for defendant based on the "allocation of risk" rationale and without addressing the question of plaintiff's "fundamental purpose" in entering into the MESA. Specifically, the court concluded that, regardless of what the parties subjectively believed about the Dow COB index, the MESA allocated the risk of market manipulation to plaintiff:

"[B]ased on the memos that came—the confidential work product memos that came of the Enron case, it appears that people who are involved in the energy industry knew or should have known that the market could be manipulated through various strategies. These things didn't all get invented in 1996 or 2000 or whenever it was that they started. This was something that the memos make reference to, had existed for some time.

"* * * * *

"* * * What that tells me is that * * * these people were *assuming* the risk. They were assuming that the COB would do whatever the COB would do. * * * But I think that it can be clearly anticipated that if that industry is deregulated, people are going to speculate, people are going to trade, there are going to be strategies involved and that's going to influence prices. Now how it influenced prices, I don't know if anybody is smart enough to figure that out, but certainly they knew or should have known that those prices would be influenced, subject to influence, and if they were willing to take the risk that those influences would always be favorable to them or at least would not be unfavorable, then that's what contracting is all about."

As noted, 212 Or App at 16 n 1, plaintiff timely appealed from the consequent judgment.[10]

### D. *The Trial Court Allows ORCP 71 Relief*

FERC continued its investigation into the practices of Enron and other market participants and the effects those practices had on energy prices in the region. In March 2003, FERC released its final report and, concurrently, thousands of pages of exhibits and other substantive documents. That evidence disclosed extraordinary manipulation of the California energy market. In fact, in a separate proceeding before FERC, *defendant* attempted to submit much of the evidence related to the FERC report, describing it as evidence of "an extreme and unprecedented market crisis[,]" and stating that the evidence showed "rampant manipulation" of the California market.[11]

---

[10] The court also granted summary judgment on plaintiff's mutual mistake and commercial impracticability claims. Again, however, those claims are not at issue in this appeal.

[11] Defendant brought that FERC action to challenge some of its contracts to *purchase* electricity. In that proceeding, defendant claimed that the contracts were

The information developed through FERC's investigation showed that market participants, including Enron, were involved in conducting "sham" transactions throughout California and "at COB." Those sham transactions purported to transfer electricity, but, in reality, did not involve actual transfers of anything. FERC concluded that such manipulative transactions violated regulations against "gaming" and served to inflate prices in the market.

On August 18, 2003, nearly one year after the trial court's entry of judgment, plaintiff moved, pursuant to ORCP 71 B, to set aside that judgment. Plaintiff asserted that "newly discovered" evidence that pertained particularly to its "frustration of purpose" claim warranted such relief. In support of its motion, plaintiff reiterated its theories of the underlying purpose of the MESA (to obtain a price below Schedule 48T) and the mutual assumptions of the parties (that the Dow COB index would reflect the "cost of producing electricity, based on actual sales of electricity at the California-Oregon border"). Plaintiff emphasized that FERC had concluded that the "new evidence" demonstrated "extensive manipulation" perpetrated by "the majority of public utility entities, and some nonpublic utilities[.]" Based on that information, plaintiff asserted that, if the "new evidence" had been available to the trial court, it would have changed the disposition of defendant's summary judgment motion, because the evidence created material issues of fact with respect to plaintiff's frustration claim as well as potential additional claims. Plaintiff did not seek ORCP 71 B relief with respect to the dismissal of its claims of "mistake" and "impracticability."

Defendant opposed ORCP 71 B relief on a variety of grounds. As pertinent to this appeal, defendant contended: (1) the new evidence could not properly support such relief because it did not exist at the time of trial; (2) plaintiff did not exercise due diligence in discovering the new evidence; (3) the new evidence was inadmissible and was not subject to judicial notice; (4) the motion was not brought within a "reasonable time"; (5) the evidence was merely cumulative of

unjust and unreasonable because of the same exceptional increase in prices that precipitated this litigation.

evidence already considered in the summary judgment record, particularly the Enron memos; and (6) the evidence would not have probably changed the underlying result, *viz.*, the allowance of summary judgment. With respect to the final ground, defendant contended both that the newly proffered evidence did not affect the correctness of the trial court's "allocation of risk" rationale for allowing summary judgment and that, even if it did, defendant still would have been entitled to summary judgment on the alternative ground that the mutually understood purpose of the MESA was to provide a rate "other than" the tariff rate and *that* purpose had not been "frustrated."

The trial court granted plaintiff's motion. In a comprehensive letter opinion, the court explained its reasons for rejecting defendant's "procedural" objections, including the alleged untimeliness of plaintiff's motion, plaintiff's purported lack of due diligence in disclosing the proffered evidence, the nonexistence of some of the evidence at the time judgment had been entered, and the supposed inadmissibility and "cumulative" nature of plaintiff's evidence. Finally, the court concluded that the new evidence was "such as will probably change the result" of the motion for summary judgment. *See Oberg*, 316 Or at 272. The court explained:

"The evidence available to the Court when the Summary Judgment was ruled upon, did not include any evidence that:

"(a) the electrical commodity market had been manipulated on the scale that [the] new evidence suggests, and

"(b) the manipulation was of such a scale and of such consequence to market prices that a reasonable business person in this field could not have reasonably foreseen the resulting manipulation of market prices, and

"(c) the manipulation included patently illegal acts on a large scale[.]

"* * * * *

"This Court's prior ruling was based on the assumption that intelligent and informed executives of these corporations * * * reasonably anticipated lawful and predictable market activity and its possible affects on the prices of the

commodity. Among those activities in commodities markets are speculation and some degree of lawful market manipulation by speculators and major players. Not included in what they would reasonably be expected to anticipate is unlawful activity or activity that is so highly manipulative that it totally distorts the market by the use of false or misleading trading practices * * *."[12]

## II. ANALYSIS

Before addressing the merits of defendant's various challenges, it is best to place them in context. We begin, then, by summarizing the standards framing our review of the allowance of ORCP 71 B relief from a summary judgment.

ORCP 71 B(1) provides, in part:

"On motion and upon such terms as are just, the court may relieve a party or such party's legal representative from a judgment for the following reasons: * * * (b) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 64 F[.]"

As noted, the decision to grant a new trial is guided by six long-established requirements:

"Newly discovered evidence which will justify a new trial:

"(1) must be such as will probably change the result if a new trial is granted;

"(2) must have been discovered since the trial;[13]

"(3) must be such as could not have been discovered before the trial by the exercise of due diligence;

---

[12] The court also noted that the new evidence suggested that defendant itself "may" have participated in unlawful market manipulation and that that might "open[ ] the door to new claims" by plaintiff. We need not, and do not, address the correctness of the trial court's observation in that regard and, particularly, whether the potential for such "new claims" might present an independent and sufficient basis for allowing ORCP 71 B relief. *See generally McWilliams v. Szymanski*, 101 Or App 617, 620, 792 P2d 457, *rev den*, 310 Or 281 (1990) (appellate court will uphold trial court's decision to grant new trial pursuant to ORCP 64 B "if it can be supported by any of the grounds on which it was sought").

[13] *But see State v. Arnold*, 320 Or 111, 120, 879 P2d 1272 (1994) (evidence discovered during trial admissible if it is "such that it cannot, with reasonable diligence, be used during trial").

"(4) must be material to the issue;

"(5) must not be merely cumulative of former evidence;

"(6) must not be merely impeaching or contradicting of former evidence."

*State v. Williams*, 2 Or App 367, 371, 468 P2d 909 (1970). We have applied that six-part test, originally developed in the context of motions for new trial under ORCP 64 B, in reviewing the allowance of ORCP 71 B relief based on "newly discovered evidence." *See Dept. of Transportation v. Stallcup*, 195 Or App 239, 252-53, 97 P3d 1229 (2004), *rev'd on other grounds*, 341 Or 93, 138 P3d 9 (2006); *accord McCathern v. Toyota Motor Corp.*, 160 Or App 201, 238, 985 P2d 804 (1999), *aff'd*, 332 Or 59, 23 P3d 320 (2001) (characterizing "newly discovered evidence" provisions of ORCP 64 B(4) and ORCP 71 B(1)(b) as "parallel[s]").

■ The interplay of ORCP 71 B and the prior allowance of summary judgment, as presented here, is involuted. Because the availability of ORCP 71 B relief ultimately depends on whether the "newly discovered evidence" would "probably change the *result* if a new trial is granted," *Oberg*, 316 Or at 272 (emphasis added), the proper referent for that inquiry—"the result"—must be the allowance of summary judgment and not merely the ground(s) on which summary judgment was allowed. Thus, the movant is not necessarily entitled to prevail, even if the newly discovered evidence would probably have controverted the ground on which the court granted summary judgment. Rather, ORCP 71 B relief must, nevertheless, be denied if the party opposing such relief was entitled to summary judgment on any other ground advanced to the trial court at the time the court entered summary judgment. The principle is analogous to "affirming on an alternative basis on appeal": The "result" would not have been affected.

■■ By parity of reasoning, the same constraints that limit an appellate court's ability to affirm on an alternative basis should apply to a trial court's consideration of grounds advanced in opposition to a motion for ORCP 71 B relief. In particular, a party who obtained summary judgment cannot, in opposing ORCP 71 B relief, advance new and qualitatively

different reasons for why it should have been entitled to summary judgment in the first instance. *See generally Outdoor Media Dimensions Inc. v. State of Oregon,* 331 Or 634, 659-60, 20 P3d 180 (2001) (describing constraints under "right for the wrong reason" doctrine). Thus, to raise and preserve for appeal the contention that the trial court erroneously allowed ORCP 71 B relief because "newly discovered evidence" was immaterial to an alternative ground on which summary judgment would properly have been allowed, the appellant must have (1) raised that alternative ground in seeking summary judgment and (2) reiterated that ground in opposing ORCP 71 B relief.

Defendant contends that the trial court erred in granting ORCP 71 B relief both because plaintiff failed to satisfy certain "procedural" requirements for such relief and because, in all events, the allowance of summary judgment remained correct even if the court could properly consider plaintiff's "newly discovered evidence." For the following reasons, we reject, in turn, each of defendant's procedural challenges.

Defendant first asserts, based on our decision in *McCathern,* that evidence "discovered since trial" must be *evidence* in existence at the time of trial. From that premise, defendant asserts that, because the evidence produced in conjunction with the FERC report did not exist at the time of trial, it cannot support the allowance of ORCP 71 B relief. Defendant misconstrues *McCathern.* In that case, we adopted the standard of many federal cases, which states that "newly discovered evidence must be of *facts* in existence at the time of the trial." 160 Or App at 237 (emphasis added). Here, as the trial court observed, "even a brief examination of the documents reveals that much of the facts asserted did exist at the time of the Judgment. Most of the material, if not all of it, refers to electrical commodity trading that occurred prior to August 2002."

Defendant next contends that plaintiff failed to exercise "due diligence" in obtaining the proffered evidence. In rejecting that challenge, the trial court observed:

"The first part of this evidence were not released until the FERC staff released its report on August 12, 2002. Additional evidence implicating [defendant] did not get released until well after that. Even if the first report were enough, given the sheer magnitude of data involved it is not reasonable to expect [plaintiff] to have marshaled that to support a motion either before the final judgment a couple weeks later or soon thereafter on a request under ORCP 64 F."

We agree. Nor, as defendant contends, should plaintiff itself have discovered, and submitted, evidence similar to what the FERC investigation ultimately uncovered. Given the sheer magnitude of the market manipulation, that suggestion blinks reality.

Defendant also asserts that plaintiff's proffered evidence could not be considered in granting a new trial because (in defendant's characterization) "it consisted almost exclusively of unauthenticated, inadmissible hearsay[.]" Plaintiff responds that ORCP 71 does not prescribe any requirements of admissibility and, particularly, does not preclude reliance on hearsay. In all events, because the "target" of the ORCP 71 B motion was the allowance of summary judgment, the proper inquiry should be whether plaintiff's evidence would have been cognizable under ORCP 47 D. Plaintiff's submissions satisfied that standard. *See* ORCP 47 D (stating that affidavits in support of summary judgment "shall set forth such facts as would be admissible in evidence").

■ Finally, defendant argues that plaintiff did not bring its motion within a "reasonable time." *See* ORCP 71 B(1) (party must file the motion "within a reasonable time, and * * * not more than one year after receipt of notice by the moving party of the judgment"). The trial court rejected that objection based on its determination that, given the volume and complexity of the documents released with the FERC report, a delay of nearly a year between the entry of judgment and the filing of the ORCP 71 B motion was not unreasonable. We concur in that view.[14]

---

[14] Defendant also contends that plaintiff's evidence could not support ORCP 71 B relief because it was "merely cumulative" of evidence—specifically the Enron memos—that plaintiff presented in opposing summary judgment. Although that objection could be characterized as "procedural," it is intertwined with defendant's

Our review thus narrows to whether the trial court erred in determining that plaintiff's new evidence would "probably [have] change[d]" the allowance of defendant's motion for summary judgment. *Oberg*, 316 Or at 272. Consistently with our understandings of the operation of ORCP 71 B with respect to relief from a summary judgment, *see* 212 Or App at 32-33, defendant advances two alternative arguments.

First, defendant argues that the new evidence does not alter the correctness of the "allocation of risk" analysis employed by the trial court in allowing summary judgment. Second, even if the new evidence created a disputed issue of material fact precluding summary judgment on the ground that the trial court invoked, the entry of judgment nevertheless remained correct because defendant would have been entitled to summary judgment on an alternative ground that the trial court never reached.

Before addressing the substance of defendant's arguments, we briefly reiterate the basics of "frustration of purpose." Again, actionable "frustration of purpose" exists in the following circumstances:

> "Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary."

*Restatement* at § 265.[15] As the commentary to that section explains:

---

contentions that the "newly discovered" evidence would not probably have affected defendant's entitlement to summary judgment. Accordingly, we consider the former in conjunction with the latter immediately below.

[15] We are mindful that "[t]he exact formulations of the Restatements are not necessarily authoritative statements of the law of this state[.]" *Anderson v. Fisher Broadcasting Co.*, 300 Or 452, 460, 712 P2d 803 (1986). Further, "[e]ven when the court decides that a particular *Restatement* principle corresponds to Oregon law, the court does not 'enact the exact phrasing of the Restatement rule, complete with comments, illustrations, and caveats.' " *Coulter Property Management, Inc. v. James*, 328 Or 164, 173 n 4, 970 P2d 209 (1998) (quoting *Brewer v. Erwin*, 287 Or 435, 455 n 12, 600 P2d 398 (1979)).

Oregon courts have long recognized the "frustration of purpose" doctrine. *See, e.g.*, *Smith Tug v. Columbia-Pac. Towing*, 250 Or 612, 641, 443 P2d 205 (1968) (reviewing history of doctrine). In doing so, Oregon courts have referred with

"First, the purpose that is frustrated must have been a principal purpose of that party in making the contract. It is not enough that he had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. * * * Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made."

*Id.* at § 265 comment a. Thus, although the "frustrated purpose" need not be mutually *held*, it must be mutually *understood*. In addition, the "frustrating event" must be an event that was mutually expected to not occur.

■　　In this context, allocation of risk is a corollary of reasonable foreseeability. As we have noted:

"[T]he doctrine[ ] of * * * frustration involve[s] the allocation of risks of unexpected occurrences which make the performance of contractual duties more burdensome than originally contemplated. * * * If the occurrence is reasonably foreseeable, courts normally take the position that the promisor has assumed the risk of * * * frustration."

*Rose City Transit v. City of Portland,* 18 Or App 369, 423, 525 P2d 1325 (1974), *aff'd as modified,* 271 Or 588, 533 P2d 339 (1975) (internal quotation marks and citation omitted; second ellipsis in original). *See also Restatement* at § 265 comment a (noting that the "foreseeability of the event is * * * a factor" in determining whether the event's nonoccurrence was an assumption of the parties, "but the mere fact that the event was foreseeable does not compel the conclusion that its non-occurrence was not such a basic assumption").

Against that backdrop, we return to defendant's first argument. Defendant asserts:

---

approval to the second *Restatement* commentary, specifically with respect to the foreseeability of "frustrating" circumstances. *Id.* at 641-42, 641-42 n 1; *Rose City Transit v. City of Portland,* 18 Or App 369, 423, 525 P2d 1325 (1974), *aff'd as modified,* 271 Or 588, 533 P2d 339 (1975). In this case, we similarly refer to the second *Restatement* as a useful distillation of principles endorsed and applied in Oregon decisions.

"[R]elevant to the instant appeal is the effect of an allocation of risk on the doctrine of frustration of purpose. A contract is, in essence, an allocation of risks. If a contract allocates to one party the risk that certain assumptions or purposes may change in the future, that party may not allege that its contractual obligations are relieved by the doctrine of frustration of purpose when those risks actually come to pass.

"* * * * *

"* * * The trial court concluded that the risk of market volatility—even of market volatility as substantial as that which occurred in late 2000 and early 2001—could have been, and effectively was, allocated to [plaintiff] in the contract. The prices were surprisingly high, but by signing a contract that relied on market prices, [plaintiff] had accepted the risk of such increases.

"Nothing in [plaintiff's] 'new evidence' could have altered the conclusion that [plaintiff] had assumed the risk of this variation in the market price. While the trial court noted in granting relief that the *scope* of the alleged manipulation was more substantial than previously believed, the *fact* of such manipulation had already been alleged, and the *fact* of the size of the market price variation had been established. Even under those circumstances, the trial court had rejected [plaintiff's] allegation that its purpose was frustrated. Given that the trial court had already correctly concluded that the contract purpose was not frustrated by price swings as substantial as those in this case, and that [plaintiff] had accepted the risk of such price swings in the presence of market manipulation, the *scope* of that manipulation is irrelevant to the analysis of whether relief from judgment should be granted."

(Emphasis in original.)

■ Notwithstanding defendant's presentation of similar arguments in opposing plaintiff's ORCP 71 B motion, the trial court—which knew its own reasons for granting summary judgment—found them unpersuasive. Rather, the court concluded that the new evidence would, at least, have raised a material factual issue as to the reasonable foreseeability—and, hence, the implicit allocation of risk—of the circumstances that caused the Dow COB index's operation to so

qualitatively deviate from the parties' predicate assumptions in selecting that index.

In particular, as noted, the court, in granting plaintiff's ORCP 71 B motion, emphasized that the summary judgment record

"did not include any evidence that:

"(a) the electrical commodity market had been manipulated on the scale that [the] new evidence suggests, and

"(b) the manipulation was of such a scale and of such consequence to market prices that a reasonable business person in this field could not have reasonably foreseen the resulting manipulation of market prices, and

"(c) the manipulation included patently illegal acts on a large scale[.]"

Given those differences, the court concluded:

"This Court's prior ruling was based on the assumption that intelligent and informed executives of these corporations * * * reasonably anticipated lawful and predictable market activity and its possible effects on the prices of the commodity. Among those activities in commodities markets are speculation and some degree of lawful market manipulation by speculators and major players. Not included in what they would reasonably be expected to anticipate is unlawful activity or activity that is so highly manipulative that it totally distorts the market by the use of false or misleading trading practices and especially when defendant in this case may have participated in those practices. This evidence is not merely cumulative. It is different in magnitude and in form."

Thus, the fact-intensive relationship between reasonable foreseeability and allocation of risk lay both at the core of the trial court's allowance of summary judgment and its allowance of ORCP 71 B relief. *See Smith Tug v. Columbia-Pac. Towing*, 250 Or 612, 643, 443 P2d 205 (1968) (" 'If [a risk] was foreseeable there should have been provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed.' " (quoting *Lloyd v. Murphy*, 25 Cal 2d 48, 54, 153 P2d 47 (1944))); *Rose City Transit*, 18 Or App at 423 ("If the occurrence is

reasonably foreseeable, courts normally take the position that the promisor has assumed the risk of * * * frustration." (internal quotation marks omitted)).

To be sure, as defendant emphasizes and the trial court acknowledged in granting summary judgment, some degree of market manipulation was reasonably foreseeable—and, thus, the risk that such reasonably foreseeable conduct might distort the Dow COB index's operation was implicitly contractually allocated to plaintiff. However—or, at least, a finder of fact could so find—plaintiff's new evidence demonstrated that California's energy markets had been subjected to manipulation so egregious and pervasive, and so unprecedented in its scope and magnitude, as to be beyond the parties' reasonable contemplation when they entered into the MESA.

Defendant contends, however, that the trial court's expressed rationale for allowing ORCP 71 B relief cannot be squared with the fact, that at the time the court granted summary judgment, it did so with full awareness of the practices described in the Enron memos. Specifically, defendant emphasizes the trial court's observation, in allowing summary judgment, that, based on the Enron memos,

> "it appears that people who are involved in the energy industry, knew or should have known that the market could be manipulated through various strategies. These things didn't all get invented in 1996 or 2000 or whenever it was that they started. * * *.
>
> "* * * * *
>
> "* * * I think it can be clearly anticipated that, if that industry is deregulated, people are going to speculate, people are going to trade, there are going to be strategies involved and that's going to influence prices."

Thus, defendant asserts, "Well before [plaintiff's] ORCP 71 motion * * * the trial court had *already* considered evidence of potential 'sham' transactions and market manipulations, and it had already concluded that such transactions did not entitle [plaintiff] to relief." (Emphasis in original.) In defendant's view, plaintiff's new evidence was merely cumulative of the Enron memos.

We perceive no inconsistency in the trial court's dispositions, for precisely the reasons that the court stated in granting ORCP 71 B relief. The Enron memos, while substantiating various manipulative practices, including sham transactions calculated to artificially inflate market prices, did not disclose manipulation so pervasive and of such a magnitude as to be beyond the contemplation of "a reasonable business person in this field." Again, that difference was central to the court's assessment of the allocation of the risk. Given that difference, the trial court properly concluded that there was, at least, an emergent disputed issue of fact as to whether, in such circumstances, plaintiff bore the risk of reliance on the Dow COB index as the variable price measure.

Defendant contends, finally, that, even assuming that the trial court did not err in determining that the new evidence sufficiently controverted the "risk allocation" ground for summary judgment, the entry of judgment remained correct because defendant was entitled to prevail on an alternative ground in support of summary judgment that the trial court never addressed.[16] Specifically, defendant contends that the evidence in the summary judgment record established that

> "[t]he primary purpose of adopting a market-based price was to reach an agreement that would enable the parties to have a five-year contract *with [plaintiff] paying other than tariff rates but without [defendant's] assuming the risk of market fluctuations during the final two years of the contract.*"

(Emphasis in original.) Defendant further reasons that there was never any frustration of *that* purpose, because "[e]ven during the limited period of high prices, the fundamental

---

[16] Defendant advanced a third argument in support of summary judgment, which it now reiterates in challenging the allowance of ORCP 71 B relief. Specifically, defendant contends that the record shows that plaintiff's asserted assumptions about the operation of the Dow COB index—*viz.*, that the prices reflected therein would reflect the marginal cost of electrical production and would be based on actual sales of electricity—were not, in fact, mutually held. However, defendant did not advance that argument cogently, so as to alert the trial court to that contention, in opposing ORCP 71 B relief. Accordingly, and consistently with the prudential constraints on our review, *see* 212 Or App at 32-33, we do not address that contention.

purpose of the MESA—to avoid paying rates other than those set by tariff—was satisfied."

In advancing that argument, defendant acknowledges plaintiff's assertion that the purpose of the MESA was to allow plaintiff to purchase electricity at a price lower than the tariff rate. However, defendant contends that, as a matter of law, that alleged purpose is insufficient to sustain a frustration claim. In particular, defendant contends that plaintiff's asserted "purpose" is nothing more than the "motive of increasing profits [that] underlies *every* business contract" (emphasis in original), and argues that such a motive cannot provide the basis of a frustration claim. *See Restatement* at § 265 comment a ("It is not enough [for a frustration claim] that the transaction has become less profitable for the affected party or even that he will sustain a loss.").

Plaintiff responds that defendant miscasts plaintiff's position and, particularly, erroneously equates a specific purpose of obtaining a price below defendant's standard tariff with a universal motive of maximizing profits. In plaintiff's words, "[M]ost parties want 'to make a profit' from their contracts; here, however, [plaintiff] sought to obtain from a monopolist a rate below its standard tariff." Further, plaintiff points to evidence that defendant knew that that was plaintiff's "contract goal." We agree with plaintiff that there is evidence, precluding summary judgment, substantiating plaintiff's characterization of its fundamental purpose in entering into the MESA and defendant's awareness of that purpose. Thus, we reject defendant's argument that, because there was an alternative basis for allowing summary judgment, the trial court should have denied ORCP 71 B relief.

Affirmed.